472 U.S. 320 (1985)
CALDWELL
v.
MISSISSIPPI
No. 83-6607.
Supreme Court of United States.
Argued February 25, 1985
Decided June 11, 1985
CERTIORARI TO THE SUPREME COURT OF MISSISSIPPI
*322 E. Thomas Boyle argued the cause and filed briefs for petitioner.
William S. Boyd III, Special Assistant Attorney General of Mississippi, argued the cause for respondent. With him on the brief were Edwin Lloyd Pittman, Attorney General, and Marvin L. White, Jr., Special Assistant Attorney General.[*]
*323 JUSTICE MARSHALL delivered the opinion of the Court, except as to Part IV-A.
This case presents the issue whether a capital sentence is valid when the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case. In this case, a prosecutor urged the jury not to view itself as determining whether the defendant would die, because a death sentence would be reviewed for correctness by the State Supreme Court. We granted certiorari, 469 U. S. 879 (1984), to consider petitioner's contention that the prosecutor's argument rendered the capital sentencing proceeding inconsistent with the Eighth Amendment's heightened "need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U. S. 280, 305 (1976) (plurality opinion). Agreeing with the contention, we vacate the sentence.[1]

*324 I
Petitioner shot and killed the owner of a small grocery store in the course of robbing it. In a bifurcated proceeding conducted pursuant to Mississippi's capital punishment statute, petitioner was convicted of capital murder and sentenced to death.
In their case for mitigation, petitioner's lawyers put on evidence of petitioner's youth, family background, and poverty, as well as general character evidence. In their closing arguments they referred to this evidence and then asked the jury to show mercy. The arguments were in large part pleas that the jury confront both the gravity and the responsibility of calling for another's death, even in the context of a capital sentencing proceeding.
"[E]very life is precious and as long as there's life in the soul of a person, there is hope. There is hope, but life is one thing and death is final. So I implore you to think deeply about this matter. It is his life or death  the decision you're going to have to make, and I implore you to exercise your prerogative to spare the life of Bobby Caldwell. . . . I'm sure [the prosecutor is] going to say to you that Bobby Caldwell is not a merciful person, but I say unto you he is a human being. That he has a life that rests in your hands. You can give him life or you can give him death. It's going to be your decision. I don't know what else I can say to you but we live in a society where we are taught that an eye for an eye is not the solution. . . . You are the judges and you will have to decide his fate. It is an awesome responsibility, I know  an awesome responsibility." App. 18-19.
*325 In response, the prosecutor sought to minimize the jury's sense of the importance of its role. Indeed, the prosecutor forcefully argued that the defense had done something wholly illegitimate in trying to force the jury to feel a sense of responsibility for its decision. The prosecutor's argument, defense counsel's objection, and the trial court's ruling were as follows:
"ASSISTANT DISTRICT ATTORNEY: Ladies and gentlemen, I intend to be brief. I'm in complete disagreement with the approach the defense has taken. I don't think it's fair. I think it's unfair. I think the lawyers know better. Now, they would have you believe that you're going to kill this man and they know  they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable. They know it. Yet they . . .
"COUNSEL FOR DEFENDANT: Your Honor, I'm going to object to this statement. It's out of order.
"ASSISTANT DISTRICT ATTORNEY: Your Honor, throughout their argument, they said this panel was going to kill this man. I think that's terribly unfair.
"THE COURT: Alright, go on and make the full expression so the Jury will not be confused. I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the Jury so they will not be confused.
"ASSISTANT DISTRICT ATTORNEY: Throughout their remarks, they attempted to give you the opposite, sparing the truth. They said `Thou shalt not kill.' If that applies to him, it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically *326 reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so." Id., at 21-22.
On review, the Mississippi Supreme Court unanimously affirmed the conviction but divided 4-4 on the validity of the death sentence, thereby affirming the sentence by an equally divided court. 443 So. 2d 806 (1983). Relying on this Court's decision in California v. Ramos, 463 U. S. 992 (1983), the prevailing opinion flatly rejected the contention that the prosecutor's comments could constitute a violation of the Eighth Amendment: "By [Ramos'] reasoning, states may decide whether it is error to mention to jurors the matter of appellate review." 443 So. 2d, at 806. The dissent did not dispute this view of Ramos, but did argue that as a matter of state law the prosecutor's argument was sufficiently unfair as to require that the death sentence be vacated. 443 So. 2d, at 815 (Lee, J., dissenting). The prevailing justices, however, found no basis in state law for disturbing the sentence. Id., at 806-807. Petitioner argues to this Court, as he argued below, that Ramos does not control this case and that the prosecutor's comments violated the Eighth Amendment.

II
Respondent first argues that this Court lacks jurisdiction to decide this issue because the decision of the Mississippi Supreme Court rests on adequate and independent state grounds. See Herb v. Pitcairn, 324 U. S. 117 (1945). Although petitioner interposed a contemporaneous objection to the prosecutor's argument, he did not initially assign the issue as error on appeal. Under Mississippi rules, "[n]o error not distinctly assigned shall be argued by counsel, except upon request of the Court, but the Court may, at its option, notice a plain error not assigned or distinctly specified." Miss. Sup. Ct. Rule 6(b) (1976). In this case, the State Supreme Court raised the issue of the prosecutor's *327 comments sua sponte. It was discussed at oral argument, in postargument briefs submitted by both sides, and in the opinion of the State Supreme Court. Respondent nevertheless argues that the decision below rests on the state-law ground of failure to comply with Rule 6.
The mere existence of a basis for a state procedural bar does not deprive this Court of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case. See Ulster County Court v. Allen, 442 U. S. 140, 152-154 (1979). Moreover, we will not assume that a state-court decision rests on adequate and independent state grounds when the "state court decision fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." Michigan v. Long, 463 U. S. 1032, 1040-1041 (1983). "If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision." Id., at 1041
An examination of the decision below reveals that it contains no clear or express indication that "separate, adequate, and independent" state-law grounds were the basis for the court's judgment. Indeed, the reference to the waiver issue in the prevailing opinion below, although somewhat cryptic, argues against the position urged by respondent. The State Supreme Court stated:
"Prueitt v. State, 261 So. 2d 119 (Miss. 1972), is a case in which we dealt with the situation where counsel sought to argue a question not raised by the assignment of error. Writing for the Court in that case, Justice Jones states `We do not deem these matters [those not assigned] plain error . . . .' Bell v. State, 360 So. 2d 1206 (Miss. 1978) . . . is analogous to the present case, in *328 that Bell dealt with errors `not urged or argued in the briefs . . . .' " 443 So. 2d, at 814.
Prueitt was a noncapital case decided by the Mississippi Supreme Court on the basis of procedural bar. But in Bell, a capital case, that court refused to rest on the procedural bar, raising on its own motion certain claims not assigned as error on appeal. It then decided those claims on the merits, explicitly holding that they were unmeritorious. 360 So. 2d, at 1215. Because Bell explicitly rested on the merits, and because the court below described Bell as "analogous to the present case in that that [it] dealt with errors `not urged or argued in the briefs,' " 443 So. 2d, at 814 (emphasis added), we can read the opinion below only as meaning that procedural waiver was not the basis of the decision.
This conclusion is substantially bolstered by the fact that the Mississippi court discussed the challenge to the prosecutor's argument at some length, evaluating it as a matter of both federal and state law before rejecting it as unmeritorious. Moreover, this conclusion is consistent with the Mississippi Supreme Court's behavior in other capital cases, where it has a number of times declined to invoke procedural bars. See, e. g., Williams v. State, 445 So. 2d 798, 810 (1984) (explicitly citing Bell as authority for the proposition that "we have in death penalty cases the prerogative of relaxing our contemporaneous objection and plain error rules when the interests of justice so require"); Culberson v. State, 379 So. 2d 499, 506 (1979) (reaching merits "only because this is a capital case" where counsel failed to follow Rule requiring prior objections to jury instructions). Given the standards of Michigan v. Long and Ulster County Court, it is apparent that we have jurisdiction.

III

A
On reaching the merits, we conclude that it is constitutionally impermissible to rest a death sentence on a determination *329 made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. This Court has repeatedly said that under the Eighth Amendment "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." California v. Ramos, 463 U. S., at 998-999. Accordingly, many of the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion. See, e. g., Eddings v. Oklahoma, 455 U. S. 104 (1982); Lockett v. Ohio, 438 U. S. 586 (1978) (plurality opinion); Gardner v. Florida, 430 U. S. 349 (1977) (plurality opinion); Woodson v. North Carolina, 428 U. S. 280 (1976).[2]
In evaluating the various procedures developed by States to determine the appropriateness of death, this Court's Eighth Amendment jurisprudence has taken as a given that capital sentencers would view their task as the serious one of determining whether a specific human being should die at the hands of the State. Thus, as long ago as the pre-Furman case of McGautha v. California, 402 U. S. 183 (1971), Justice Harlan, writing for the Court, upheld a capital sentencing scheme in spite of its reliance on jury discretion. The sentencing scheme's premise, he assumed, he assumed, was "that jurors confronted with the truly awesome responsibility of decreeing *330 death for a fellow human will act with due regard for the consequences of their decision . . . ." Id., at 208. Belief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an "awesome responsibility" has allowed this Court to view sentencer discretion as consistent with  and indeed as indispensable to  the Eighth Amendment's "need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, supra, at 305 (plurality opinion). See also Eddings v. Oklahoma, supra; Lockett v. Ohio, supra.

B
In the capital sentencing context there are specific reasons to fear substantial unreliability as well as bias in favor of death sentences when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court.

(1)
Bias against the defendant clearly stems from the institutional limits on what an appellate court can do  limits that jurors often might not understand. The "delegation" of sentencing responsibility that the prosecutor here encouraged would thus not simply postpone the defendant's right to a fair determination of the appropriateness of his death; rather it would deprive him of that right, for an appellate court, unlike a capital sentencing jury, is wholly ill-suited to evaluate the appropriateness of death in the first instance. Whatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record. This inability to confront and examine the individuality of the defendant would be particularly devastating to any argument for consideration of what this Court has termed "[those] compassionate or mitigating factors stemming from the diverse frailties of humankind." Woodson, supra, at 304. When we held that a defendant has a constitutional right to the consideration of such factors, Eddings, supra; Lockett, supra, we *331 clearly envisioned that that consideration would occur among sentencers who were present to hear the evidence and arguments and see the witnesses. As the dissenters below noted:
"The [mercy] plea is made directly to the jury as only they may impose the death sentence. Under our standards of appellate review mercy is irrelevant. There is no appellate mercy. Therefore, the fact that review is mandated is irrelevant to the thought processes required to find that an accused should be denied mercy and sentenced to die." 443 So. 2d, at 817 (Lee, J., joined by Patterson, C. J., and Prather and Robertson, JJ., dissenting).
Given these limits, most appellate courts review sentencing determinations with a presumption of correctness. This is the case in Mississippi, where, as the dissenters below pointed out: "Even a novice attorney knows that appellate courts do not impose a death penalty, they merely review the jury's decision and that review is with a presumption of correctness." Id., at 816 (Lee, J., joined by Patterson, C. J., and Prather and Robertson, JJ., dissenting). See also Miss. Code Ann. § 99-19-105 (Supp. 1984) (defining scope of appellate review of capital sentencing).

(2)
Writing on this kind of prosecutorial argument in a prior case, JUSTICE STEVENS noted another reason why it presents an intolerable danger of bias toward a death sentence: Even when a sentencing jury is unconvinced that death is the appropriate punishment, it might nevertheless wish to "send a message" of extreme disapproval for the defendant's acts. This desire might make the jury very receptive to the prosecutor's assurance that it can more freely "err because the error may be corrected on appeal." Maggio v. Williams, 464 U. S. 46, 54-55 (1983) (concurring in judgment). A defendant might thus be executed, although no *332 sentencer had ever made a determination that death was the appropriate sentence.

(3)
Bias could similarly stem from the fact that some jurors may correctly assume that a sentence of life in prison could not be increased to a death sentence on appeal. See Arizona v. Rumsey, 467 U. S. 203, 211 (1984). The chance that this will be the assumption of at least some jurors is increased by the fact that, in an argument like the one in this case, appellate review is only raised as an issue with respect to the reviewability of a death sentence. If the jury understands that only a death sentence will be reviewed, it will also understand that any decision to "delegate" responsibility for sentencing can only be effectuated by returning that sentence. But for a sentencer to impose a death sentence out of a desire to avoid responsibility for its decision presents the specter of the imposition of death based on a factor wholly irrelevant to legitimate sentencing concerns. The death sentence that would emerge from such a sentencing proceeding would simply not represent a decision that the State had demonstrated the appropriateness of the defendant's death.[3] This would thus also create the danger of a defendant's being executed in the absence of any determination that death was the appropriate punishment.

(4)
In evaluating the prejudicial effect of the prosecutor's argument, we must also recognize that the argument offers jurors a view of their role which might frequently be highly *333 attractive. A capital sentencing jury is made up of individuals placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice. They are confronted with evidence and argument on the issue of whether another should die, and they are asked to decide that issue on behalf of the community. Moreover, they are given only partial guidance as to how their judgment should be exercised, leaving them with substantial discretion. See, e. g., Eddings v. Oklahoma, 455 U. S. 104 (1982); Lockett v. Ohio 438 U. S. 586 (1978); Woodson v. North Carolina, 428 U. S. 280 (1976). Given such a situation, the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role. Indeed, one can easily imagine that in a case in which the jury is divided on the proper sentence, the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in.
This problem is especially serious when the jury is told that the alternative decisionmakers are the justices of the state supreme court. It is certainly plausible to believe that many jurors will be tempted to view these respected legal authorities as having more of a "right" to make such an important decision than has the jury. Given that the sentence will be subject to appellate review only if the jury returns a sentence of death, the chance that an invitation to rely on that review will generate a bias toward returning a death sentence is simply too great.

C
It is, therefore, not surprising that legal authorities almost uniformly have strongly condemned the sort of argument offered by the prosecutor here. For example, this has been the view of almost all of the State Supreme Courts that have dealt with this question since Furman v. Georgia, 408 *334 U. S. 238 (1972).[4] Indeed, even before Furman the sort of argument offered by the prosecutor here was viewed as clearly improper by most state courts, whether in capital or noncapital cases.[5] The American Bar Association, in its standards for prosecutorial conduct, agrees with this judgment.[6] And even the Mississippi Supreme Court, since deciding Caldwell, has adopted the position that arguments very similar to that used here are sufficiently improper to merit vacating a death sentence. See Wiley v. State, 449 So. 2d 756 (1984); Williams v. State, 445 So. 2d 798 (1984).

*335 IV
The State advances three arguments for why the death sentence should be upheld despite the prosecutor's comments. First, the State argues that under California v. Ramos, 463 U. S. 992 (1983), each State may decide for itself the extent to which a capital sentencing jury should know of postsentencing proceedings. Second, it defends the prosecutor's comments as "invited," in the sense that they were a reasonable response to defense counsel's arguments. Last, the State asserts that an application of this Court's decision in Donnelly v. DeChristoforo, 416 U. S. 637 (1974), precludes a finding of constitutional error based on the sort of impropriety that the state prosecutor's comments are said to contain. None of these arguments is persuasive.

A
Both respondent and the prevailing justices of the Mississippi Supreme Court interpreted California v. Ramos, supra, as if it had held that States are free to expose capital sentencing juries to any information and argument concerning postsentencing procedures. This is too broad a view of Ramos.
Ramos concerned the constitutionality of California's statutory requirement that capital sentencing juries be informed that the State Governor could commute a sentence of life imprisonment without possibility of parole into a lesser sentence that included the possibility of parole. In upholding this requirement, the Court rested on a determination that this instruction was both accurate and relevant to a legitimate state penological interest  that interest being a concern for the future dangerousness of the defendant should he ever return to society. 463 U. S., at 1001-1006. The Court concluded that this legitimate sentencing concern gave the jury a valid interest in accurate information on the possibility of parole.
*336 In contrast, the argument at issue here cannot be said to be either accurate or relevant to a valid state penological interest. The argument was inaccurate, both because it was misleading as to the nature of the appellate court's review and because it depicted the jury's role in a way fundamentally at odds with the role that a capital sentencer must perform. Similarly, the prosecutor's argument is not linked to any arguably valid sentencing consideration. That appellate review is available to a capital defendant sentenced to death is no valid basis for a jury to return such a sentence if otherwise it might not. It is simply a factor that in itself is wholly irrelevant to the determination of the appropriate sentence. The argument here urged the jurors to view themselves as taking only a preliminary step toward the actual determination of the appropriateness of death  a determination which would eventually be made by others and for which the jury was not responsible. Creating this image in the minds of the capital sentencers is not a valid state goal, and Ramos is not to the contrary. Indeed, Ramos itself never questioned the indispensability of sentencers who "appreciat[e] . . . the gravity of their choice and . . . the moral responsibility reposed in them as sentencers." Id., at 1011.

B
Respondent next defends the view of the Mississippi Supreme Court that the prosecutor's argument must be understood as a response to the defense counsel's argument, and that it was not unreasonable in that context. But neither respondent nor the court below explains how the prosecutor's argument was less likely to have distorted the jury's deliberations because of anything defense counsel said.
The Mississippi Supreme Court was less than clear as to the theory of "context" it embraced. The prevailing justices commented on two aspects of the defense's arguments. First, "during defense counsel's argument, . . . he inaccurately sought to convince the jury that if they meted out a life sentence the defendant would remain in prison the remainder *337 of his life. He left them with the impression that there would be no parole or commutation of sentence." 443 So. 2d, at 814. Second, the opinion noted that "[defense counsel had] emphasized his pitch for mercy by referring to the Ten Commandments, Jesus and the Heavenly Father." Ibid.
The first of these arguments, of course, recalls Ramos, in which the Court stated that an instruction describing the alternative to a death sentence as " `life imprisonment without possibility of parole' may generate the misleading impression that the Governor could not commute this sentence to one that included the possibility of parole." 463 U. S., at 1004-1005, n. 19. But although in Ramos the Court concluded that this possible misimpression underscored a valid sentencing need to give more information on the Governor's power to commute life sentences, there is no rational link between the possibility of this specific misimpression and the argument used by the prosecutor in this case. The prosecutor's argument simply had nothing to do with the consequences that would flow from the life sentence mentioned by defense counsel.
The connection between defense counsel's references to religious themes and texts and the prosecutor's arguments regarding appellate review is similarly unclear. As the dissenting justices noted: "Assuming without accepting the majority's position that the defense counsel's argument invited error, it did not invite this error. Asking the jury to show mercy does not invite comment on the system of appellate review. This is true whether the plea for mercy discusses Christian, Judean or Buddhist philosophies, quotes Shakespeare or refers to the heartache suffered by the accused's mother." 443 So. 2d, at 817.

C
The State seeks to bolster its argument regarding the context of the prosecutor's comments by arguing that, under this Court's decision in Donnelly v. DeChristoforo, supra, the comments of a state prosecutor should rarely be considered *338 violative of federal constitutional rights. The State points out that Donnelly stands for the proposition that "not every trial error or infirmity which might on direct appeal of a federal conviction call for an application of a federal appellate court's . . . supervisory powers correspondingly constitute the denial of due process." Brief for Respondent 25. But although Donnelly does clearly warn against holding every improper and unfair argument of a state prosecutor to be a federal due process violation, it does not insulate all prosecutorial comments from federal constitutional objections. For a number of reasons, this case is substantially different from Donnelly.
Donnelly was a first-degree murder case in which a state prosecutor responded to defense counsel's expression of hope that the jury would return a verdict of not guilty by saying "I quite frankly think that [the defendant and his attorney] hope that you find him guilty of something a little less than first-degree murder." 416 U. S., at 640. DeChristoforo's attorney objected and the trial judge later gave this curative instruction:
" `Closing arguments are not evidence for your consideration. . . .
" `Now in his closing, the District Attorney, I noted made a statement: "I don't know what they want you to do by way of a verdict. They said they hope that you find him not guilty. I quite frankly think that they hope you find him guilty of something a little less than first-degree murder." There is no evidence of that whatsoever, of course, you are instructed to disregard that statement made by the District Attorney.
" `Consider the case as though no such statement was made.' " Id., at 641.
The Supreme Judicial Court of Massachusetts viewed the prosecutor's comment as improper but "held that it was not so prejudicial as to require a mistrial and further stated that the trial judge's instruction `was sufficient to safeguard the *339 defendant's rights.' " Ibid. Although the District Court denied habeas relief, the Court of Appeals granted it. This Court reversed because an "examination of the entire proceedings" did not support the contention that the "prosecutor's remark . . . by itself so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id., at 643.
Two important factors, both emphasized in Donnelly, distinguish Donnelly from Caldwell's case. Most important, the trial judge in Donnelly, who observed the prosecutor's remarks as well as the whole of the trial, had agreed that those remarks were improper, had believed that the unfairness was correctable through an instruction, and had in fact given the jury a strong curative instruction. As this Court said:
"[T]he trial court took special pains to correct any impression that the jury could consider the prosecutor's statements as evidence in the case. The prosecutor, as is customary, had previously told the jury that his argument was not evidence, and the trial judge specifically re-emphasized that point. Then the judge directed the jury's attention to the remark particularly challenged here, declared it to be unsupported, and admonished the jury to ignore it. Although some occurrences at trial may be too clearly prejudicial for such a curative instruction to mitigate their effect, the comment in this case is hardly of such character." Id., at 644 (footnotes omitted).
The trial judge in this case not only failed to correct the prosecutor's remarks, but in fact openly agreed with them; he stated to the jury that the remarks were proper and necessary, strongly implying that the prosecutor's portrayal of the jury's role was correct.
Second, the prosecutor's remarks in Donnelly were quite different from the remarks challenged here. The Donnelly Court emphasized that the prosecutor's comment was "admittedly *340 an ambiguous one," id., at 645, and declared that the case was not one "in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right." Id., at 643 (citing Griffin v. California, 380 U. S. 609 (1965)). Here, in contrast, the prosecutor's remarks were quite focused, unambiguous, and strong. They were pointedly directed at the issue that this Court has described as "the principal concern" of our jurisprudence regarding the death penalty, the "procedure by which the State imposes the death sentence." California v. Ramos, 463 U. S., at 999. In this case, the prosecutor's argument sought to give the jury a view of its role in the capital sentencing procedure that was fundamentally incompatible with the Eighth Amendment's heightened "need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U. S., at 305 (plurality opinion). Such comments, if left uncorrected, might so affect the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment.[7]

*341 V
This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its "truly awesome responsibility." In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires. The sentence of death must therefore be vacated. Accordingly, the judgment is reversed to the extent that it sustains the imposition of the death penalty, and the case is remanded for further proceedings.
It is so ordered.
JUSTICE POWELL took no part in the decision of this case.
JUSTICE O'CONNOR, concurring in part and concurring in the judgment.
I join the judgment and the opinion of the Court, with the exception of Part IV-A. I write separately to express my views about the Court's discussion of California v. Ramos, 463 U. S. 992 (1983), in Part IV-A. I do not read Ramos to imply that the giving of nonmisleading and accurate information regarding the jury's role in the sentencing scheme is irrelevant to the sentencing decision.
The Court distinguishes the prosecutor's remarks regarding appellate review in this case from the Briggs instruction in Ramos, which informed the jury that the Governor could *342 commute a life sentence without parole. The Court observes that the Briggs instruction in Ramos was "both accurate and relevant to a legitimate state penological interest  that interest being a concern for the future dangerousness of the defendant should he ever return to society." Ante, at 335. The statement here, the Court concludes, was neither accurate nor relevant. In my view, the prosecutor's remarks were impermissible because they were inaccurate and misleading in a manner that diminished the jury's sense of responsibility. I agree there can be no "valid state penological interest" in imparting inaccurate or misleading information that minimizes the importance of the jury's deliberations in a capital sentencing case. Ante, at 336.
The Court, however, seems generally to characterize information regarding appellate review as "wholly irrelevant to the determination of the appropriate sentence." Ibid. The Court correctly observes that Ramos does not imply that "States are free to expose capital sentencing juries to any information and argument concerning postsentencing procedures" no matter how inaccurate. Ante, at 335. Certainly, a misleading picture of the jury's role is not sanctioned by Ramos. See California v. Ramos, supra, at 1010. But neither does Ramos suggest that the Federal Constitution prohibits the giving of accurate instructions regarding postsentencing procedures. See 463 U. S., at 1004, n. 19, 1012, n. 27.
Jurors may harbor misconceptions about the power of state appellate courts or, for that matter, this Court to override a jury's sentence of death. Should a State conclude that the reliability of its sentencing procedure is enhanced by accurately instructing the jurors on the sentencing procedure, including the existence and limited nature of appellate review, I see nothing in Ramos to foreclose a policy choice in favor of jury education.
As the Court notes, however, the Mississippi prosecutor's argument accomplished the opposite result. In telling the jurors, "your decision is not the final decision . . . [y]our job *343 is reviewable," the prosecutor sought to minimize the sentencing jury's role, by creating the mistaken impression that automatic appellate review of the jury's sentence would provide the authoritative determination of whether death was appropriate. In fact, under Mississippi law the reviewing court applies a "presumption of correctness" to the sentencing jury's verdict. 443 So. 2d 806, 817 (1983) (Lee, J., dissenting). The jury's verdict of death may be overturned only if so arbitrary that it "was against the overwhelming weight of the evidence," or if the evidence of statutory aggravating circumstances is so lacking that a "judge should have entered a judgment of acquittal notwithstanding the verdict." Williams v. State, 445 So. 2d 798, 811 (Miss. 1984).
Laypersons cannot be expected to appreciate without explanation the limited nature of appellate review, especially in light of the reassuring picture of "automatic" review evoked by the sentencing court and the prosecutor in this case. Ante, at 325-326. Although the subsequent remarks of the prosecutor to which JUSTICE REHNQUIST refers in his dissent, post, at 345-346, may have helped to restore the jurors' sense of the importance of their role, I agree with the Court that they failed to correct the impression that the appellate court would be free to reverse the death sentence if it disagreed with the jury's conclusion that death was appropriate. See ante, at 340-341, n. 7. I believe the prosecutor's misleading emphasis on appellate review misinformed the jury concerning the finality of its decision, thereby creating an unacceptable risk that "the death penalty [may have been] meted out arbitrarily or capriciously," California v. Ramos, supra, at 999, or through "whim . . . or mistake," Eddings v. Oklahoma, 455 U. S. 104, 118 (1982) (concurring opinion).
JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE WHITE join, dissenting.
The Court holds that under the Eighth Amendment it is "constitutionally impermissible to rest a death sentence on *344 a determination made by a sentencer who has been led to believe that the responsibility for the appropriateness of the defendant's death rests elsewhere." Ante, at 328-329. Even if I were to agree with this proposition in the abstract, I do not believe that under the circumstances of this case it can properly be applied to justify the overturning of petitioner's death sentence.
Petitioner robbed a grocery and bait shop owned by a Mr. and Mrs. Faulkner. When Mrs. Faulkner screamed, petitioner shot her twice and fled with a bank bag taken from the counter. After a trial the jury found petitioner guilty of capital murder, and the case proceeded to the sentencing phase. At that point the prosecution sought to prove four aggravating factors under Mississippi law, including the facts that the offense was committed while petitioner was engaged in a robbery, and that petitioner had previously been convicted of four felonies involving the use of threats or violence to the person. With respect to the latter factor the prosecution introduced evidence that petitioner had been convicted of felonies four times since 1975  twice for armed robbery, once for attempted armed robbery, and once for aggravated assault. In mitigation petitioner introduced testimony from family and friends emphasizing petitioner's youth and his sound upbringing, and indicating that he was a nice person and a hard worker.
At the guilt phase the jurors had been instructed that they were the "sole judges of the facts," and that it was their duty to find those facts in accordance with the evidence presented, and to apply the rules of law charged by the judge to the facts found. The jurors were also charged that statements made by counsel were not evidence. Prior to closing argument at the sentencing phase the judge further charged the jury that it "must now decide whether the Defendant will be sentenced to death or to life imprisonment." To return the death penalty, the jury was instructed that it must find at least one aggravating circumstance, and that the aggravating circumstances found must outweigh the mitigating circumstances.
*345 Counsel then presented closing arguments. Pursuant to Mississippi law the prosecutor spoke first and last; his initial statement for the most part argued the aggravating factors, and petitioner does not complain of anything said there. Defense counsel then spoke; as the Court indicates, this argument consisted mostly of a plea for mercy, which emphasized the jury's "awesome responsibility." The prosecutor then made the rebuttal argument of which petitioner complains. Because the Court mischaracterizes the prosecutor's statements, it is worth noting again what the prosecutor actually said:
"I'm in complete disagreement with the approach the defense has taken. . . . I think it's unfair. . . . Now, they would have you believe that you're going to kill this man and they know  they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable."
At this point defense counsel objected, but the trial court allowed the prosecutor to continue after stating: "I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands. I think that information is now needed by the jury so they will not be confused."
Counsel continued:
"[Defense counsel] insinuat[ed] that your decision is the final decision and that they're gonna take Bobby Caldwell out in front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court."
The Court's account stops here, but the prosecutor went on to state:
"Now, thank God, you have a yardstick to follow. Thank God, you have a set of rules and regulations like they do in a football game. What are the rules and *346 regulations that you, under your oath, must follow in determining the punishment? Number 1, under your oath, you must decide the facts. That's your job. Not mine, not theirs, not the Judge's, not anybody's  yours. You decide what those facts are. I can't tell you what they are, and you take the rules of law  this right here  the rule book, and you apply them, and you render a fair and impartial trial without passion, without prejudice, without sympathy." (Emphasis supplied.)
The prosecutor then recounted some of the recent history of capital punishment in this country, explaining that this Court originally struck down state capital punishment statutes because of its perception that the death penalty was being imposed arbitrarily. The prosecutor concluded by noting that in response to this Court's concern over arbitrariness
"our Mississippi Legislature . . . adopted the very procedure that you are undergoing now. They said before the death penalty is arbitrarily automatically imposed, the Jury  the people  the people, not the Court  the people, the heart of the system, must determine  must determine  that the aggravating circumstances, those which tend to say that the death penalty is justified must outweigh the mitigating circumstances, those which say that the lesser should be applied. So, that's how it all evolved, and that's why you're in the Jury Box to determine the punishment, and that's why, I think it's totally improper to put you in the picture of hang man with a black mask on. That's not fair. You must take the rules, apply the law, and render a fair verdict."
At several points in its opinion the Court supplies its own characterization of the prosecutor's argument. Thus, the Court states that this is a case where "a sentencer . . . has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere," *347 ante, at 329, and that "[t]he argument here urged the jurors to view themselves as taking only a preliminary step toward the actual determination of the appropriateness of death  a determination which would eventually be made by others and for which the jury was not responsible." Ante, at 336. See also ante, at 333. The Court then builds on this characterization by supplying a further assumption  that a jury that has a lowered sense of responsibility is more likely to vote for the death penalty. The Court hypothesizes that a capital sentencing jury may wish to "send a message" of disapproval even though it is not convinced that death is the appropriate punishment, and that a jury that has been assured that any "error" in imposing the death penalty can be corrected on appeal may feel comfortable with "delegating" its responsibility by voting for death. This "delegation" of responsibility to the appellate courts violates the Eighth Amendment, the Court reasons, because an appellate court is unable to confront and examine the individual circumstances of the defendant firsthand, and is further bound to review the jury's determination with a presumption of correctness. Finally, after distinguishing our decisions in California v. Ramos, 463 U. S. 992 (1983), and Donnelly v. DeChristoforo, 416 U. S. 637 (1974), the Court concludes that the sentence here must be overturned because the prosecutor's argument was "fundamentally incompatible with the Eighth Amendment's heightened `need for reliability in the determination that death is the appropriate punishment in a specific case.' " Ante, at 340 (quoting Woodson v. North Carolina, 428 U. S. 280, 305 (1976) (plurality opinion)).
In Donnelly v. DeChristoforo, this Court rejected a claim that a state murder conviction should be overturned on due process grounds because of statements made by the prosecutor during closing argument. We there stressed that "not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a `failure to observe that fundamental fairness essential to the *348 very concept of justice.' " 416 U. S., at 642 (quoting Lisenba v. California, 314 U. S. 219, 236 (1941)). Similarly, this Court's recent opinions concerning the Eighth Amendment, while recognizing that the "qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination," California v. Ramos, supra, at 998-999, have also noted that in general the Eighth Amendment is satisfied where the procedures ensure that the sentencer's discretion is "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Zant v. Stephens, 462 U. S. 862, 874 (1983); Barclay v. Florida, 463 U. S. 939, 950 (1983) (plurality opinion). Thus, in both Zant and Barclay we upheld death sentences despite the fact that they had been based in part on invalid aggravating circumstances, where the jury also had found valid aggravating circumstances.
Donnelly, Zant, and Barclay teach that a death sentence need not be vacated in every case where the procedures by which it is imposed are in some way flawed. If the prosecutor in this case actually had argued to the jury that it should go ahead and impose the death sentence because it did not really matter  the appellate court would correct any "mistake" the jury might make in choice of sentence  and if the trial judge had not corrected such an argument, I might well agree that the process afforded did not comport with some constitutional norm related to procedural fairness. But despite the Court's sweeping characterization the argument here fell far short of telling the jury that it would not be responsible for imposing the death penalty. Admittedly, some of the remarks early in the prosecutor's rebuttal indicated that the jury's decision was not "final" because it was subject to appellate review. But viewed in its entirety, cf. Cupp v. Naughten, 414 U. S. 141 (1973), it is evident that the thrust of the prosecutor's argument was that the jury was not solely responsible for petitioner's sentence. In addition *349 to appellate review, the prosecutor referred to the decision of the Mississippi Legislature to allow capital punishment, to the rules that the jury must follow in determining the appropriate sentence, and to the jury's ultimate responsibility under the law to render a "fair verdict," "without passion, without prejudice, without sympathy."
There is nothing wrong with urging a capital sentencing jury to disregard emotion and render a decision based on the law and the facts. Despite the Court's rhetorical references to the need for "reliable" sentencing decisions rendered by jurors that comprehend their "awesome responsibility," I do not understand the Court to believe that emotions in favor of mercy must play a part in the ultimate decision of a capital sentencing jury. Indeed, much of our Eighth Amendment jurisprudence has been concerned with eliminating emotion from sentencing decisions. Here the prosecutor did not suggest that the prospect of appellate review should lead the jurors to lean toward the death penalty, and the prosecutor's statements that followed the challenged portion of the argument forcefully emphasized the jury's important role under Mississippi law in determining whether to impose death.
Indeed, under the circumstances here the importance of the jury's role could hardly have been lost on the jurors themselves. The charge at the guilt phase highlighted the jurors' role as factfinders and their duty to follow the law in reaching their conclusions. The importance of their role at sentencing was evident from the charge, from the impassioned plea for mercy from petitioner's counsel, petitioner, and petitioner's mother, as well as from the prosecutor's rebuttal. It is indeed difficult to agree with the Court that a group subjected to all this attention nevertheless interpreted a few remarks by the prosecutor to mean that the group's decision was no more than a sideshow  a mere "preliminary step" toward the ultimate sentencing determination.
Once it is recognized that the Court has overstated the seriousness of the prosecutor's comments the Court's analysis *350 tumbles like a house of cards. Given that it is highly unlikely that the jury's sense of responsibility was diminished, there is no need to respond to the Court's conjecture that the jury would in addition have "delegated" its responsibility by erring in favor of imposing the death penalty. And even assuming that the challenged statements were in some way infirm, I believe this is a case where we should heed the directives of Donnelly, Zant, and Barclay, and hold that any error did not amount to constitutional error. During the course of a heated trial prosecutors may make many statements that stray from debating society rules as to relevancy, but the ultimate inquiry must be whether the statements rendered the proceedings as a whole fundamentally unfair. I do not believe this analysis is substantially altered because the challenged statements were made during a capital sentencing proceeding. Although the fact that this is a capital case calls for careful review of applicable legal principles, it seems to me that the Court's concern would be essentially the same if at the guilt phase the prosecutor had told the jury to go ahead and convict because any mistakes would be corrected on appeal. Cf. ante, at 334, n. 5, and authorities cited therein.
I therefore find unconvincing the Court's scramble to identify an independent Eighth Amendment norm that was violated by the statements here. The Court's string citations to our prior cases, many of which yielded only plurality opinions, which hold that capital sentencing juries must be allowed to consider all forms of mitigating evidence so as to facilitate individualized and rational determinations of the appropriateness of capital punishment, simply highlight the lack of authority for the path that the Court now takes. Nor do I find particularly illuminating the citation to dicta that the Eighth Amendment requires procedures that will ensure a "reliable" determination that death is an appropriate punishment. Although the Eighth Amendment requires certain processes designed to prevent the arbitrary imposition of *351 capital punishment, it does not follow that every proceeding that strays from the optimum is ipso facto constitutionally unreliable. Zant and Barclay hold as much.
Nor does the Eighth Amendment prohibit any and all communication to a capital sentencing jury concerning the availability of appellate review. In California v. Ramos, we upheld against Eighth Amendment challenge a California statute that required capital sentencing juries to be informed that the sentence of life without possibility of parole was subject to commutation by the Governor. We noted, inter alia, that the instruction was "merely an accurate statement of a potential sentencing alternative," 463 U. S., at 1009, and held that informing the jury of the possibility of commutation did not inject too speculative a concern into the jury's deliberations. Although we noted in Ramos that the challenged information bore more than marginal relevance to the jury's sentencing determination, Ramos is not distinguishable from this case on that ground; there is no constitutional requirement that all information received by a sentencing jury be "relevant." In any event, the fact that the jury's determination is subject to appellate review, if not common knowledge, is in any event information concerning the judicial process that one would think the jury is entitled to know. Nor do I think this case distinguishable from Ramos because here the prosecutor's statements "misrepresented" the appellate process. There are circumstances where misrepresentations by prosecutors will violate due process, see Miller v. Pate, 386 U. S. 1 (1967); Brady v. Maryland, 373 U. S. 83 (1963), but here the reference to appellate review certainly did not include an express statement that such review was de novo, and any implication along those lines was cured by the later statements emphasizing the jury's responsibility under the Mississippi sentencing scheme.
This Court should avoid turning every perceived departure from what it conceives to be optimum procedure in a capital case into a ground for constitutional reversal. In this case *352 the State of Mississippi proved four aggravating factors, including that petitioner previously had been convicted of four crimes involving threat of violence to a person. The jury was instructed to find the facts based upon the evidence and to apply those facts to the law as charged; at the sentencing proceeding it was told that it must find that the aggravating factors outweighed the mitigating factors, and the prosecutor's argument stressed these aspects of the jury's singular duty. There is no indication in the record that the jury returned the death sentence on any basis other than the evidence adduced, nor is there any reason to question the jury's conclusion. Under those circumstances I do not think that the Eighth Amendment or any other provision of the Constitution requires that petitioner's death sentence be overturned.[*] I would affirm the judgment of the Mississippi Supreme Court.
NOTES
[*] Briefs of amici curiae were filed for the State of Arizona et al. by David Crump, Jean F. Powers, Robert K. Corbin, Attorney General of Arizona, Steve Clark, Attorney General of Arkansas, Austin J. McGuigan, Chief State's Attorney of Connecticut, and John M. Massameno, Assistant State's Attorney, Jim Smith, Attorney General of Florida, Linley E. Pearson, Attorney General of Indiana, Robert T. Stephan, Attorney General of Kansas, William J. Guste, Jr., Attorney General of Louisiana, John Ashcroft, Attorney General of Missouri, Michael T. Greely, Attorney General of Montana, Paul L. Douglas, Attorney General of Nebraska, Lacy H. Thornburg, Attorney General of North Carolina, Anthony J. Celebrezze, Jr., Attorney General of Ohio, Michael C. Turpen, Attorney General of Oklahoma, T. Travis Medlock, Attorney General of South Carolina, Mark V. Meierhenry, Attorney General of South Dakota, Jim Mattox, Attorney General of Texas, and Gerald L. Baliles, Attorney General of Virginia; and for the National Association of Criminal Defense Lawyers et al. by Daniel F. Kolb, Nancy R. Grunberg, Ephraim Margolin, Richard J. Wilson, Dennis N. Balske, and John Charles Boger.
[1] Petitioner also raises a challenge to his conviction, arguing that there was constitutional infirmity in the trial court's refusal to appoint various experts and investigators to assist him. Mississippi law provides a mechanism for state appointment of expert assistance, and in this case the State did provide expert psychiatric assistance to Caldwell at state expense. But petitioner also requested appointment of a criminal investigator, a fingerprint expert, and a ballistics expert, and those requests were denied. The State Supreme Court affirmed the denials because the requests were accompanied by no showing as to their reasonableness. For example, the defendant's request for a ballistics expert included little more than "the general statement that the requested expert `would be of great necessarius witness.' " 443 So. 2d 806, 812 (1983). Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision. Cf. Ake v. Oklahoma, 470 U. S. 68, 82-83 (1985) (discussing showing that would entitle defendant to psychiatric assistance as matter of federal constitutional law). We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought.
[2] See also Barefoot v. Estelle, 463 U. S. 880, 924 (1983) (BLACKMUN, J., dissenting) (Woodson's concern for assuring heightened reliability in the capital sentencing determination "is as firmly established as any in our Eighth Amendment jurisprudence"); Eddings v. Oklahoma, 455 U. S., at 118 (O'CONNOR, J., concurring) ("[T]his Court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake"); Godfrey v. Georgia, 446 U. S. 420, 443 (1980) (BURGER, C. J., dissenting) ("[I]n capital cases we must see to it that the jury has rendered its decision with meticulous care").
[3] We note that in Mississippi, for example, "[i]f the jury does not make the findings requiring the death sentence" the court must impose a sentence of life imprisonment. Miss. Code Ann. § 99-19-101(3)(c) (Supp. 1984). Indeed, "[i]f the jury cannot, within a reasonable time, agree as to punishment" the court must similarly impose a sentence of life imprisonment. § 99-19-103.
[4] See, e. g., Hawes v. State, 240 Ga. 327, 333, 240 S. E. 2d 833, 839 (1977) (setting aside death sentence in spite of counsel's failure to object to prosecutor's argument); Fleming v. State, 240 Ga. 142, 146, 240 S. E. 2d 37, 40 (1977) (setting aside death sentence in spite of curative instruction); State v. Willie, 410 So. 2d 1019, 1034-1035 (La. 1982) (use of this argument by prosecutor calls for setting aside death sentence even in the absence of other improprieties); State v. Jones, 296 N. C. 495, 498-499, 251 S. E. 2d 425, 427 (1979) (ordering new trial on issue of guilt in capital case where argument was used during guilt phase even though there was no contemporaneous objection); State v. White, 286 N. C. 395, 404-405, 211 S. E. 2d 445, 450 (1975) (ordering new trial on issue of guilt in capital case where argument was used during guilt phase even though trial judge gave curative instruction); State v. Gilbert, 273 S. C. 690, 696-698, 258 S. E. 2d 890, 894 (1979) (setting aside death sentence in spite of defendant's failure to raise issue on appeal).
[5] See, e. g., People v. Morse, 60 Cal. 2d 631, 649-653, 388 P. 2d 33, 44-47 (1964); Pait v. State, 112 So. 2d 380, 383-384 (Fla. 1959); Blackwell v. State, 79 So. 731, 735-736 (Fla. 1918); People v. Johnson, 284 N. Y. 182, 30 N. E. 2d 465 (1940); Beard v. State, 19 Ala. App. 102, 95 So. 333 (1923). See generally Annot., Prejudicial Effect of Statement of Prosecutor that if Jury Makes Mistake in Convicting It Can Be Corrected by Other Authorities, 3 A. L. R. 3d 1448 (1965); Annot., Prejudicial Effect of Statement of Court that if Jury Makes Mistake in Convicting It Can Be Corrected by Other Authorities, 5 A. L. R. 3d 974 (1966).
[6] See ABA Standards for Criminal Justice 3-5.8 (2d ed. 1980) ("References to the likelihood that other authorities, such as the governor or the appellate courts, will correct an erroneous conviction are impermissible efforts to lead the jury to shirk responsibility for its decision"). Id., at 3.90.
[7] The dissent argues that Donnelly does in fact control this case because the prosecutor's argument regarding appellate review was "corrected" by later prosecutorial comments, even if uncorrected by the judge. We disagree.

In the dissent's view, because the prosecutor did later say that the jury played an important role in the sentencing process, the argument as a whole merely emphasized "that the jury was not solely responsible for petitioner's sentence." Post, at 348. But even if the prosecutor's later comments did leave the jury with the view that they had an important role to play, the prosecutor did not retract, or even undermine, his previous insistence that the jury's determination of the appropriateness of death would be reviewed by the appellate court to assure its correctness. As we have discussed, in one crucial sphere of a system of capital punishment, the capital sentencer comes very near to being "solely responsible for [the defendant's] sentence," ibid., and that is when it makes the often highly subjective, "unique, individualized judgment regarding the punishment that a particular person deserves." Zant v. Stephens, 462 U. S. 862, 900 (1983) (REHNQUIST, J., concurring in judgment). It is beyond question that an appellate court, performing its task with a presumption of correctness, would be relatively incapable of evaluating the "literally countless factors that [a capital sentencer] consider[s,]" id., at 901, in making what is largely a moral judgment of the defendant's desert. The prosecutor's erroneous suggestion that a moral judgment in favor of death would be reviewed for error  a suggestion endorsed by the trial judge  was never corrected.
[*] The Court notes that other state courts have condemned the type of argument challenged here, ante, at 334, and that the Mississippi Supreme Court, since its decision in this case, has also found such an argument to be reversible error. See Williams v. State, 445 So. 2d 798 (1984). But these facts suggest that draconic intervention by this Court in the name of the Eighth Amendment generally is not required to correct aspects of state procedure that appear less than ideal to all of us. Doctrinal development in the tradition of the common law, where state-court decisions commend themselves not by their authority but by their reason, ultimately bids fair to remedy such minor departures from procedural norms as may be involved in this case.