**UNITED STATES of America**

v.

**David Paul HAMMER, Appellant**

**No. 98–9011.**

United States Court of Appeals, Third Circuit.

Jan. 5, 2001.

Before: BECKER, Chief Judge, and SLOVITER, MANSMANN, SCIRICA, NYGAARD, ALITO, ROTH, McKEE, RENDELL, BARRY, AMBRO, FUENTES, STAPLETON, and GREENBERG, Circuit Judges.

## SUR PETITION FOR REHEARING

The petition for rehearing filed by appellant David Paul Hammer in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the court in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court en banc, the petition for rehearing is denied. Judge Stapleton's and Judge Greenberg's votes are limited to denying rehearing before the original panel. Judge Nygaard would grant rehearing by the court en banc and is filing an opinion sur denial of the petition.

NYGAARD, Circuit Judge, Sur denial of petition for en banc rehearing.

I would grant Hammer's petition for en banc rehearing. In my view, this case presents profoundly difficult and important questions demanding the consideration of the full Court, and I fear that we have squandered this opportunity to plumb the depths of our death penalty jurisprudence. There are, at minimum, six issues that the panel opinion fails to resolve convincingly.

First, the center of the panel's primary premise no longer holds. The panel placed great importance on its conclusion that "Hammer has without equivocation asked us to dismiss his appeal and has indicated that he will not change his mind with respect to his request." The panel's reliance on Hammer's statements is highly dubious at best, and, at worst, simply preposterous. Hammer's various requests in this case are far from "without equivocation," and indicate to me a mind torn by confusion. He initially presented an insanity defense, but later abandoned that defense and pleaded guilty to murder. Seven days after the jury's capital verdict, Hammer announced that he would proceed *pro se* and waive all appeals because he wished to die. Three months later he filed an appeal. He then moved to withdraw the motion to forego the appeal. After this motion was granted, he again filed a *pro se* motion to withdraw the appeal. Several months later, he moved to withdraw the motion to withdraw the appeal. That motion was also granted. But then, in another reversal, he again moved to withdraw his appeal. Thereafter, he moved to withdraw his motion to withdraw his appeal. Hammer then filed a letter with the court seeking to dismiss his appeal, and he appeared before a panel of this Court via video and articulated his desire to waive all appeals and be promptly executed. After this video conference, stand-by counsel moved (with Hammer's consent) to withdraw the motion to withdraw the appeal. With the panel now skeptical of Hammer's certitude, it required him to state directly his request to withdraw the motion to withdraw.

One week later Hammer stated that he had consented to the motion to withdraw the motion to withdraw the appeal, but he changed his mind over that week and restated his preference for prompt execution. At this point, the panel granted his motion to withdraw the appeal in its August 31, 2000 opinion. The panel failed to reference the full extent of Hammer's irresolution, noting only that Hammer had "vacillated" but always "reverted to his original intent to waive an appeal and have the sentence of death carried out." The panel found this "original intent," stated seven days after the issuance of his sentence, to somehow indicate Hammer's true desire. In an attempt to hold Hammer to a final position upon which it could base its decision, the panel opinion stated:

Near the end of his statement [via video conference] he once again demonstrated that he accepted responsibility for his acts by saying that the only way he could make amends was to accept the punishment. The panel, of course, was mindful that Hammer had vacillated with respect to the prosecution of that appeal and thus at the end of Hammer's statement we asked him:

Are you saying to us that if we dismiss this appeal you're not going to come back to us and ask us to hear your appeal later?

Hammer responded: Yes, sir.

Moreover, between his argument on July 18, and the August 31 panel opinion, Hammer again changed his mind *twice;* first by requesting that his appeal go forward, and then by withdrawing that same request. Finally, as the panel should have anticipated based on this record, Hammer has now filed a petition for executive clemency and a motion to recall our mandate and reinstate his appeal. Thus, the bedrock beneath the panel's decision to allow Hammer to be executed without any direct review of the merits of that sentence has crumbled.

This set of facts dramatically demonstrates that we must have a meaningful standard by which to determine the propriety and sincerity of a motion to waive or withdraw appeals in capital cases. The panel's opinion is predicated on the supposition that Hammer preferred immediate execution at the time of oral argument. If oral argument had been conducted a few weeks earlier or later, then the panel would have found Hammer elsewhere in the flux of his indecision. Hammer has changed his position on the record more than one dozen times, yet we are holding him to his "original intent" and statements he made to the panel. With a life hanging in the balances of justice, I cannot agree. We have no reason to grant special credence to Hammer's statements at that moment or any particular moment on this record. We are compelled by common

sense and logic to look at the whole record. The panel is either basing its decision unreasonably upon Hammer's statement that he would not again change his mind or willing to ignore his importunations when he does. The panel quite unreasonably based its decision upon Hammer's statement that he would not again change his mind, and because of that poor judgment it now insists that Hammer must die with that statement and without the appellate review he now requests. The panel's position is arbitrary and just plain wrong.

If we allow capital defendants to waive their right to appeal, then we must develop a standard that will better assure that the request for waiver is sound, certain, and appropriate. Because traditionally we have expected capital defendants to exhaust their appeals, Hammer presents novel concerns. Hammer will not be the last capital defendant who will state in the emotional aftershock of being sentenced to die that he would prefer a prompt and certain death to an extended appellate process, yet we have not taken any steps to frame our review of these motions. Some capital defendants who waive the right to appeal may be genuinely guilty, and be the beneficiaries of fair trials. However, statistically we know that others will be wrongfully convicted and subjected to unwarranted sentences. Some in the latter category may prefer a prompt death to a life, or even an extended, term in prison. Currently we have no procedural safeguards in place to protect against such scenarios, and our opinion presents no reason to forbid immediate executions if a desire to die is expressed, even equivocally, by the defendant.

The Court did undertake a competency determination, following which psychiatrists found that "Hammer was fully competent," and that his decision to forego an appeal and to be executed immediately "was a competent and well-reasoned decision." Standing alone, however, such a competency determination is wholly inadequate to conclude that Hammer possessed

the conviction that must accompany such an unretractable decision to forego review and be put to death. At a minimum, we should require a capital defendant to express a consistent desire to waive his or her appeal over a meaningful period of time. Ideally, I would require that we conduct a full review whenever a capital defendant appeals—irrespective of motions to withdraw the appeal.

Justice Marshall believed that such a decision requires many months of consideration:

> I cannot agree with the views expressed by the Chief Justice [Burger] that Gilmore has competently, knowingly, and intelligently decided to let himself be killed. Less than five months have passed since the commission of the crime; just over two months have elapsed since sentence was imposed. That is hardly enough time for mature consideration of the question, nor does Gilmore's erratic behavior from his suicide attempt to his state habeas petition evidence such deliberation.

*Gilmore v. Utah,* 429 U.S. 1012, 1019, 97 S.Ct. 436, 440, 50 L.Ed.2d 632 (1976) (Marshall, J., dissenting). In scenarios where the capital defendant has expressed uncertainty about his or her waiver, as we have here, we should, at minimum, review an attempt to waive appellate review with extreme disfavor. Here, however, the panel holds Hammer to the "original in-tent" he expressed seven days after sentencing despite his obvious uncertainty. I find such a holding factually unjustifiable and jurisprudentially dangerous.

Second, Hammer admitted that he murdered his cell mate for the sole purpose of "earning" a capital sentence, and thereby ending his life in prison. Standing the criminological basis of sentencing on its head, the death penalty here was thus an incentive, rather than a deterrent, to murder. Hammer wholly frustrates the underlying justifications for capital punishment. The death penalty served as neither a specific deterrent to Hammer nor will it serve as a general deterrent to future offenders who prefer execution to imprisonment.

This is the "Hammer dilemma" with which we must wrestle. In my view, it presents an example of the potentially perverse logic supporting retributive justifications for capital punishment. We are not "getting even." Hammer has won! Although Kant, the founder of modern retributivism, argued that we are affirmatively obligated to execute capital offenders, because in doing so, we honor their autonomy to commit the offense and accept the corollary punishment in order to balance the moral scale, here Hammer has usurped the power of the state as the guardian of that equilibrium and manipulates and controls it to serve his self-interest. *See* Immanuel Kant, The Philosophy of Law 195 (W. Hastie trans., 1887). The opinion broadly states that Hammer "accepts his punishment." But the meaning of such a statement is unclear since Hammer only accepts the government's ceremony of death, without any indication that he even nods toward its altar or recognizes a whit of his moral debt or need for penitence. Serving neither utilitarian nor deontological penological objectives, it is not evident to me why death is the appropriate sentence in this case. But, of course, that is beyond the range of our review. Here, nonetheless, the state has become the willing, if unwitting, accomplice in Hammer's suicide, his facially inconsistent statements notwithstanding.

Third, we delude ourselves by believing that Hammer is not using the state to assist in his suicide. The panel's opinion states that Hammer "indicated that if he had a choice to live he would do so but that he was not living, he merely was 'existing' in a small confined area with only brief time out for showers and exercise.... He said that he would die in prison and he preferred the certainty of knowing when and how he would die." "Hammer then said," the panel continued, "that he would only be free when he was, dead, and he

flatly denied that he was committing suicide." I fail to see how the panel can reconcile Hammer's statements that his current situation "was not living" and that he preferred the "certainty of knowing when and how he would die" with his claim that we should not understand that he murdered his cell mate so that he could earn a death sentence, and subsequently waived his appeals, as a calculated effort to end his own life. I cannot help but note the similarity of Hammer's position with the pleas of the terminally ill for assisted suicide or the reasons cited for suicide generally. Hammer's position is paradigmatically suicidal: He will be free, he claims, when he is dead. He plainly enlists the Court in his suicide, and we disingenuously eschew an analysis of the propriety of this form of state assisted suicide.

This "Hammer dilemma" has happened before and will happen again. Gary Gilmore became notorious, not for the two innocent persons he murdered execution-style, but because he participated in his own punishment. Gilmore refused to appeal his capital sentence, rebuked attempts by others to help him, and insisted upon dying. As Mikal Gilmore said of his brother:

> He made [the death penalty advocates] not just his allies, but he transformed them into his servants: men who would kill at his bidding, to suit his own ideals of ruin and redemption. By insisting on his own execution—and in effect directing the legal machinery that would bring that execution about—Gary seemed to be saying: "There's really nothing you can do to punish me, because this is precisely what I want, this is my will. You will help me with my final murder."

Mikal Gilmore, Shot In The Heart xi (1994). Like Gilmore, Hammer deliberately makes the state his accomplice and has forced the hand of our Court to reward his commission of murder and authorize his suicide.

Fourth, considering that Hammer committed murder so that he would be execut-ed, we should not be surprised that he wished to waive his right to appeal and forego judicial review altogether to facilitate his execution. Our decision to allow Hammer to waive his right to appeal, and incredibly, to refuse to allow him to reinstate this right after a change of heart, surely contravenes both the humanitarian concerns that the criminal justice system should embody and Supreme Court precedent that has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321, 111 S.Ct. 731, 739, 112 L.Ed.2d 812 (1991); *see also Gardner v. Florida*, 430 U.S. 349, 357–58, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 ("[D]eath is a different kind of punishment from any other which may be imposed in this country. From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."); *Caldwell v. Mississippi*, 472 U.S. 320, 329, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985)("[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.").

Fifth, resolving the ambiguity in 18 U.S.C. § 3595 is not to me, as our opinion states, "immediately evident." Section 3595(a) states, in part:

> In a case in which a sentence of death is imposed, the sentence shall be subject to review by the court of appeals upon appeal by the defendant. Notice of appeal must be filed within the time specified for the filing of a notice of appeal.

The disputed clause states that the capital sentence "shall be subject to review by the

court of appeals upon appeal by the defendant." The panel claims that the "plain import" of this provision is to provide for optional appellate review at the discretion of the defendant. The panel understood this provision to state a conditional: If the defendant appeals, then the sentence will be subject to appellate review. The countervailing and equally viable interpretation, however, holds that the sentence necessarily "shall be subject to review" and the provision reasonably presumes that all capital sentences will be appealed. Thus the phrase "upon appeal" states an expectation, *a posteriori*, that all death sentences will be appealed. These competing interpretations are not resolved as simply as the panel leads us to believe. The panel claims that "if Congress had intended that there be a mandatory review of death penalty proceedings it had no need to provide that this sentence was 'subject to review ... upon appeal of the defendant.'" To the contrary, the *de facto* presumption must be that a capital offender will indeed seek appellate review, and if Congress had intended to allow waiver of review in capital cases then it could have simply stated that such sentences were not mandatory or "subject to review ... *only* upon appeal of the defendant." Considering the stakes of this hermeneutic difficulty, it would require a much more convincing argument than that provided in the opinion to persuade me that Congress had indeed intended to afford capital offenders the opportunity to withdraw or waive their rights to appellate review.

Sixth, the panel's ultimate determination, as it admits, is discretionary. After purportedly resolving the ambiguities of § 3595, the panel concludes "that we have discretion to either grant or deny Hammer's motion to dismiss his appeal...." Following the obligatory Eighth Amendment analysis and a reiteration that they may exercise discretion in these matters, the panel then concluded:

> Hammer is a confessed murderer who not only pleaded guilty but also obtained what he believes was a fair trial on the penalty phase of the case .... At all events, we have carefully considered the entire record and concluded that, in the circumstances, the interests of justice do not require that he be compelled to appeal or that we review the district court proceedings on the merits. We have considered the options, but are satisfied that the proper course is to exercise our discretion to grant Hammer's motion to dismiss. The case will be remanded to the district court to fix an early new date for the implementation of the sentence of death.

Here, the panel cloaks its discretion with the opaque assertion that "the interests of justice do not require that he be compelled to appeal." I find that analytically bald conclusion insufficient to justify our ruling in such a grave matter.

Because we are leaving this case rife with unanswered questions of critical importance, I would grant Hammer's petition for en banc rehearing to answer them.