*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————————

JOHN DAVID STUMPF,

        *Petitioner-Appellant,*

    *v.*

MARC C. HOUK, Warden,

        *Respondent-Appellee.*

No. 01-3613

On Remand from the United States Supreme Court.
No. 96-00668—George C. Smith, District Judge.

Argued: July 26, 2007

Decided and Filed: August 11, 2011

Before: BOGGS, DAUGHTREY, and MOORE, Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** Alan M. Freedman, MIDWEST CENTER FOR JUSTICE, LTD., Evanston, Illinois, for Appellant. Stephen E. Maher, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Alan M. Freedman, Carol R. Heise, MIDWEST CENTER FOR JUSTICE, LTD., Evanston, Illinois, for Appellant. Stephen E. Maher, Charles L. Wille, Carol Ann Ellensohn, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

    DAUGHTREY, J., delivered the opinion of the court, in which MOORE, J., joined. BOGGS, J. (pp. 19–26), delivered a separate dissenting opinion.

—————————————

**OPINION**

—————————————

    MARTHA CRAIG DAUGHTREY, Circuit Judge. Recent polling results and statistical compilations support many of the economic and penological arguments that have long been raised in opposition to the imposition of the death penalty in the United

1

States.[1]   Other statistics bolster objections to a form of punishment that, possibly because of its finality, has been shown to have been misdirected.   Such polemical discussions, while interesting, are, however, better suited for the deliberations in the chambers of our state and national legislatures.   In this appeal, we are not asked to involve ourselves in those debates, or even in a discussion of the constitutionality of the death penalty.   Instead, we are required to examine only the constitutional ramifications of court proceedings that are alleged to have infringed John David Stumpf's right to be sentenced in accordance with longstanding principles of due process and fundamental fairness.   We conclude that those principles were violated by the state in seeking to execute Stumpf even after it became clear that the basis for the imposition of the death penalty had been seriously compromised in the subsequent prosecution of Stumpf's accomplice, as further explained below.   Indeed, the facts of this case exemplify the arbitrariness that prior decisions of the United States Supreme Court and of this court have decried as violative of fundamental constitutional safeguards.   As a result, we once again reverse the judgment of the district court and remand this matter for issuance of a writ of habeas corpus, unless the State of Ohio conducts a new sentencing hearing for Stumpf within 90 days of the issuance of this opinion.

## I.  *FACTUAL AND PROCEDURAL BACKGROUND*

This habeas case is now before the Sixth Circuit for the second time.   Because of the lengthy procedural journey this litigation has taken, numerous state and federal courts have had an opportunity to delve into the facts that led to the conviction and sentencing of petitioner Stumpf.   Rather than add yet another gloss to those facts, we reiterate the testimony and initial procedural history that the United States Supreme Court found relevant in its opinion in *Bradshaw v. Stumpf*, 545 U.S. 175 (2005):

> On May 14, 1984, Stumpf and two other men, Clyde Daniel Wesley and Norman Leroy Edmonds, were traveling in Edmonds'[s] car along Interstate 70 through Guernsey County, Ohio.   Needing money for gas, the men stopped the car along the highway.   While Edmonds waited in the car, Stumpf and Wesley walked to the home of Norman and Mary

---

[1]See, e.g., http://www.deathpenaltyinfo.org/documents/FactSheet.pdf (updated May 20, 2011).

Jane Stout, about 100 yards away. Stumpf and Wesley, each concealing a gun, talked their way into the home by telling the Stouts they needed to use the phone. Their real object, however, was robbery: Once inside, Stumpf held the Stouts at gunpoint, while Wesley ransacked the house. When Mr. Stout moved toward Stumpf, Stumpf shot him twice in the head, causing Mr. Stout to black out. After he regained consciousness, Mr. Stout heard two male voices coming from another room, and then four gunshots – the shots that killed his wife. Edmonds was arrested shortly afterward, and his statements led the police to issue arrest warrants for Stumpf and Wesley. Stumpf, who surrendered to the police, at first denied any knowledge of the crimes. After he was told that Mr. Stout had survived, however, Stumpf admitted to participating in the robbery and to shooting Mr. [Stout]. But he claimed not to have shot Mrs. Stout, and he has maintained that position ever since.

The proceedings against Stumpf occurred while Wesley, who had been arrested in Texas, was still resisting extradition to Ohio. Stumpf was indicted for aggravated murder, attempted aggravated murder, aggravated robbery, and two counts of grand theft. With respect to the aggravated murder charge, the indictment listed four statutory "specifications" -- three of them aggravating circumstances making Stumpf eligible for the death penalty. See App. 117-118; Ohio Rev. Code Ann. § 2929.03 (Anderson 1982). The case was assigned to a three-judge panel in the Court of Common Pleas.

Rather than proceed to trial, however, Stumpf and the State worked out a plea agreement: Stumpf would plead guilty to aggravated murder and attempted aggravated murder, and the State would drop most of the other charges; with respect to the aggravated murder charge, Stumpf would plead guilty to one of the three capital specifications, with the State dropping the other two. The plea was accepted after a colloquy with the presiding judge, and after a hearing in which the panel satisfied itself as to the factual basis for the plea.

Because the capital specification to which Stumpf pleaded guilty left him eligible for the death penalty, a contested penalty hearing was held before the same three-judge panel. Stumpf's mitigation case was based in part on his difficult childhood, limited education, dependable work history, youth, and lack of prior serious offenses. Stumpf's principal argument, however, was that he had participated in the plot only at the urging and under the influence of Wesley, that it was Wesley who had fired the fatal shots at Mrs. Stout, and that Stumpf's assertedly minor role in the murder counseled against the death sentence. See § 2929.04(B)(6) (directing the sentencer to consider as a potential mitigating circumstance, "[i]f the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense"). The State, on

the other hand, argued that Stumpf had indeed shot Mrs. Stout. Still, while the prosecutor claimed Stumpf's allegedly primary role in the shooting as a special reason to reject Stumpf's mitigation argument, the prosecutor also noted that Ohio law did not restrict the death penalty to those who commit murder by their own hands – an accomplice to murder could also receive the death penalty, so long as he acted with the specific intent to cause death. As a result, the State argued, Stumpf deserved death even if he had not personally shot Mrs. Stout, because the circumstances of the robbery provided a basis from which to infer Stumpf's intent to cause death. The three-judge panel, agreeing with the State's first contention, specifically found that Stumpf "was the principal offender" in the aggravated murder of Mrs. Stout. App. 196. Determining that the aggravating factors in Stumpf's case outweighed any mitigating factors, the panel sentenced Stumpf to death.

Afterward, Wesley was successfully extradited to Ohio to stand trial. His case was tried to a jury, before the same judge who had presided over the panel overseeing Stumpf's proceedings, and with the same prosecutor. This time, however, the prosecutor had new evidence: James Eastman, Wesley's cellmate after his extradition, testified that *Wesley* had admitted to firing the shots that killed Mrs. Stout. The prosecutor introduced Eastman's testimony in Wesley's trial, and in his closing argument he argued for Eastman's credibility and lack of motive to lie. The prosecutor claimed that Eastman's testimony, combined with certain circumstantial evidence and with the implausibility of Wesley's own account of events, proved that Wesley was the principal offender in Mrs. Stout's murder – and that Wesley therefore deserved to be put to death. One way Wesley countered this argument was by noting that the prosecutor had taken a contrary position in Stumpf's trial, and that Stumpf had already been sentenced to death for the crime. Wesley also took the stand in his own defense, and testified that Stumpf had shot Mrs. Stout. In the end, the jury sentenced Wesley to life imprisonment with the possibility of parole after 20 years.

After the Wesley trial, Stumpf, whose direct appeal was still pending in the Ohio Court of Appeals, returned to the Court of Common Pleas with a motion to withdraw his guilty plea or vacate his death sentence. Stumpf argued that Eastman's testimony, and the prosecution's endorsement of that testimony in Wesley's trial, cast doubt upon Stumpf's conviction and sentence. The State (represented again by the same prosecutor who had tried both Wesley's case and Stumpf's original case) disagreed. According to the prosecutor, the court's first task was to decide whether the Eastman testimony was sufficient to alter the court's prior determination that Stumpf had been the shooter. *Id.* at 210. Contrary to the argument he had presented in the Wesley trial, however, the prosecutor now noted that Eastman's testimony was belied by certain

other evidence (ballistics evidence[2] and Wesley's testimony in his own defense) confirming Stumpf to have been the primary shooter. In the alternative, the State noted as it had before that an aider-and-abettor theory might allow the death sentence to be imposed against Stumpf even if he had not shot Mrs. Stout.

Although one judge speculated during oral argument that the court's earlier conclusion about Stumpf's principal role in the killing "may very well have had an effect upon" the prior sentencing determination, *ibid.*, the Court of Common Pleas denied Stumpf's motion in a brief summary order without explanation. That order was appealed together with the original judgment in Stumpf's case, and the Ohio Court of Appeals affirmed, as did the Ohio Supreme Court. *See State v. Stumpf*, 32 Ohio

---

[2]Interestingly, the ballistics evidence clearly did not necessarily implicate Stumpf in the shooting of Mrs. Stout. We detailed that ballistics testimony in our prior decision in this case as follows:

> Of the two bullets that struck [Mr.] Stout, only pieces of each were recovered. Part of the bullet that struck him between the eyes was recovered during surgery, while a second fragment was found in the second bedroom. A portion of the bullet that struck Stout in the top of the head was recovered during surgery, but part of it had to be left in place. Another bullet was recovered from the mattress of the second bedroom.

> Stout's wife was shot four times in the first bedroom. She died from three gunshots to the left side of her head. The fourth bullet went through her left wrist and struck her chest without penetrating the skin of her chest. A fifth bullet was recovered from the wall of that bedroom, above the headboard of the bed.

> The chrome Raven[, Edmonds's handgun that Stumpf and Wesley had carried into the home along with Wesley's black .25 caliber pistol,] was never recovered by the police, and Stumpf admitted that he had thrown it out of the car window after he and Wesley had left the Stout residence. The black .25 caliber pistol was recovered by the police after the men sold it, along with one of Stout's guns, to an individual in Washington, Pennsylvania. Ronald Dye, a ballistics expert from the Ohio Bureau of Criminal Identification and Investigation, a division of the Ohio Attorney General's office, testified at Stumpf's factual basis hearing as to the forensic findings regarding bullets and cartridge cases recovered from the murder scene. Dye testified that there were eight spent cartridges found at the scene, that seven of them had been fired by one gun, and one was fired by a different gun. Dye also said that the black pistol, which had been recovered by the police, fired one bullet, while the other seven bullets were all fired by the same gun. That gun could have been the chrome Raven, or one of several other types of guns.

> At Stumpf's plea proceeding, the prosecutor argued that the ballistics evidence supported the conclusion that Stumpf had shot Mrs. Stout, since she was apparently shot with the same weapon used against her husband, saying, "There's ample evidence to conclude that this defendant fired all shots that hit anybody, because the same gun fired all of those shots." However, during Wesley's trial, the same prosecutor put Eastman, Wesley's cellmate, on the witness stand, to repeat Wesley's confession to him. According to Eastman, Wesley told him that after Stumpf had shot Stout in the face, he dropped the chrome Raven and ran, at which point Wesley picked up the pistol and shot Mrs. Stout. This version of the crime was also supported by the ballistics evidence that the black pistol had a tendency to jam after firing just one round, which may have led Wesley to discard it after shooting it only once.

*Stumpf v. Mitchell*, 367 F.3d 594, 597-98 (6th Cir. 2004).

St.3d 95, 512 N.E.2d 598 (1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1060, 98 L.Ed.2d 1022 (1988).

After a subsequent request for state postconviction relief was denied by the state courts, Stumpf filed this federal habeas petition in the United States District Court for the Southern District of Ohio in November 1995. The District Court denied Stumpf relief, but granted permission to appeal on four claims, including the two at issue here. The United States Court of Appeals for the Sixth Circuit reversed, concluding that habeas relief was warranted on "either or both" of "two alternative grounds." *Stumpf v. Mitchell*, 367 F.3d 594, 596 (2004). First, the court determined that Stumpf's guilty plea was invalid because it had not been entered knowingly and intelligently. More precisely, the court concluded that Stumpf had pleaded guilty to aggravated murder without understanding that specific intent to cause death was a necessary element of the charge under Ohio law. See Ohio Rev. Code Ann. §§ 2903.01(B) and (D). Noting that Stumpf had all along denied shooting Mrs. Stout, and considering those denials inconsistent with an informed choice to plead guilty to aggravated murder, the Court of Appeals concluded that Stumpf must have entered his plea out of ignorance. Second, the court concluded that "Stumpf's due process rights were violated by the state's deliberate action in securing convictions of both Stumpf and Wesley for the same crime, using inconsistent theories." 367 F.3d, at 596. This violation, the court held, required setting aside "both Stumpf's plea and his sentence." *Id.*, at 616. One member of the panel dissented.

*Bradshaw v. Stumpf*, 545 U.S. at 178-82 (footnote omitted).

After examining the transcript of Stumpf's plea hearing, the Supreme Court disagreed with our analysis regarding the knowing and voluntary nature of the petitioner's admission of guilt. Thus, finding that we "erred in concluding that Stumpf was uninformed about the nature of the charge he pleaded guilty to, [the Court] reverse[d] that portion of the judgment . . . ." *Id.* at 186.

The Court determined that we were "also wrong to hold that prosecutorial inconsistencies between the Stumpf and Wesley cases required voiding Stumpf's guilty plea." *Id.* at 186-87. Nevertheless, the majority opinion noted that "[t]he prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence, . . . for it is at least arguable that the sentencing panel's conclusion about Stumpf's principal role in the offense was material to its sentencing determination." *Id.*

at 187. Because it was not clear to the Court whether we "would have concluded that Stumpf was entitled to re-sentencing had [we] not also considered the conviction invalid," *id.*, the majority vacated that second portion of our opinion and remanded the matter to us "to consider . . . the question of how Eastman's testimony and the prosecutor's conduct in the Stumpf and Wesley cases relate to Stumpf's death sentence in particular." *Id.* at 187-88. We now undertake to comply with that directive.

## II. *DISCUSSION*

### A. Standard of Review

Stumpf filed his original habeas corpus petition in federal district court in November 1995. The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104-132, 110 Stat. 1214 (1996), effective April 24, 1996, do not, therefore, apply to this case. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). Consequently, we review the district court's denial of the writ of habeas corpus *de novo* and its factual findings for clear error. *See McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *overruled on other grounds in In re Abdur'Rahman* 392 F.3d 174 (6th Cir. 2004), *judgment vacated in Bell v. Abdur'Rahman*, 545 U.S. 1151 (2005). We accord some deference to state-court factual findings, which may be rebutted only by "clear and convincing evidence." *Id.* Such deference, however, applies only to "basic, primary facts" found by a state court, not to mixed questions of fact and law, which we also review *de novo*. *See id.* Because Stumpf's due process claim is just such a mixed question, we subject it to *de novo* review. *See Stumpf v. Mitchell*, 367 F.3d at 616 (citing *Williams v. Coyle*, 260 F.3d 684, 706-07 (6th Cir. 2001)).

### B. State of Ohio's Affirmative Defenses

In its brief before this court on remand, the State of Ohio first insists that we may not reach the merits of Stumpf's due process claim that the Supreme Court directed us to address. The state offers three rationales for its position: (1) Stumpf failed to present in the district court a claim that his death sentence was imposed in violation of due process principles; (2) Stumpf also failed to present this claim to the Ohio state courts,

thus procedurally defaulting the issue; and (3) the due process claim seeks application of a new rule of constitutional law that is barred by the holding of *Teague v. Lane*, 489 U.S. 288 (1989).  Notably, although this case has already been reviewed by the district court, by this court, and by the Supreme Court, the State of Ohio has not seen fit to raise these procedural arguments before now.  *See Bradshaw v. Stumpf*, 545 U.S. at 190 (Thomas, J., concurring) ("the State has not argued that *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), forecloses Stumpf's claim that the prosecution's presentation of inconsistent theories violated his right to due process"); *see also id.* at 191 (Thomas, J., concurring) ("[t]he State also has not argued that Stumpf procedurally defaulted his due process claim").

### 1.  Failure to Present Sentencing Claim

The state's belated contention that the petitioner did not fully litigate in the district court the due process claim at issue on remand is baseless.  In his habeas corpus petition, Stumpf included, under the heading "seventh claim for relief," the following paragraphs:

> 76) The trial court's denial of a motion to vacate a sentence, or to withdraw a plea of guilty which is based upon evidence that did not exist at the time of trial and which the petitioner could not have presented at trial, violated the petitioner's protections under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

> 77) The trial court would not allow the defense to present a cellmate of the co-defendant to testify that he heard the co-defendant confess to being the principal offender.  The confession transpired after the sentencing of the petitioner.  The court erroneously ruled that the confession was not newly discovered evidence.

> 78) The Ohio Fifth District Court of Appeals erroneously held that it was not error even though the state of Ohio tried the co-defendant as the principal in the co-defendant's trial.  The court found the petitioner to be "one of the principal slayers."  Ohio law defines the principal as the actual killer.  All evidence points to the co-defendant as the principal.

It is no doubt true, as claimed by the state, that the habeas petition sought redress for the failure *of the trial court* to allow certain evidence, not for the actions *of the*

*prosecution* in pursuing conflicting criminal convictions.  Nevertheless, the district court invited briefing and argument and actually ruled upon the very issue that the state now argues was not before that court.  In fact, in a February 2001 opinion, the district judge specifically addressed Stumpf's argument that "the testimony of Wesley's cellmate implicating Wesley as the actual shooter, entitled petitioner . . . to have a new sentencing hearing."  Three months later, in overruling Stumpf's motion to alter or amend the judgment denying him habeas corpus relief, the district judge again alluded to the fact that he "was 'troubled' by the possibility that the state might have secured petitioner's death sentence by arguing that he was the actual shooter, while later arguing during Wesley's trial that Wesley was the actual shooter."  It is patently clear to us, therefore, even if not to the state, that Stumpf did not fail to present this issue to the district court.  The State of Ohio's waiver argument is meritless.

## 2.  Procedural Default

We next conclude that the state has waived its claim that Stumpf procedurally defaulted his due process argument by failing to raise it in Ohio state court.  Justices Thomas and Scalia, concurring in the judgment in *Bradshaw v. Stumpf*, conceded that the state did not raise procedural default as a defense in a timely manner.  *See Bradshaw v. Stumpf*, 545 U.S. at 191.  Those two justices continued, however, by noting that "[t]he Court's opinion does not preclude the State from advancing [such a] procedural defense[] on remand."  *Id.*  True, but we also have the authority to decline to exercise our discretion to entertain that argument at this stage of the litigation and, instead, rely upon the Court's earlier pronouncement in *Banks v. Dretke*, 540 U.S. 668, 705 (2004), that "under pre-AEDPA law, exhaustion and procedural default defenses could be waived based on the State's litigation conduct."  In fact, "[i]f the . . . claim was addressed at some stage of federal proceedings, the [State] would have been obligated to raise procedural default as a defense, *or lose the right to assert the defense thereafter*."  *Gray v. Netherland*, 518 U.S. 152, 166 (1996) (emphasis added) (citations omitted).

Stumpf has argued throughout his habeas proceedings that his death sentence must be overturned as a result of the state's duplicitous theories of culpability.  Not until

the Supreme Court remanded the matter to this court, however, has the State of Ohio deemed it necessary to allege any procedural irregularities in responding to and litigating that claim. Such transparent attempts at gamesmanship at this late date should not be indulged.

### 3. *Teague v. Lane* Bar

Nor does the bar fashioned in *Teague v. Lane*, 489 U.S. 288 (1989), restrict our review of Stumpf's constitutional claim. In *Teague*, the Supreme Court held that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Id.* at 310. In their concurring opinion, Justices Thomas and Scalia correctly quoted *Horn v. Banks*, 536 U.S. 266, 271 (2002), for the proposition that "if the State *does* argue that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply *Teague* before considering the merits of the claim." *Bradshaw v. Stumpf*, 545 U.S. at 190-91 (Thomas, J., concurring) (first emphasis added). In this case, however, the State of Ohio "has *not* argued [until this remanded review] that Stumpf's habeas claims were barred as requiring announcement of a new rule." *Bradshaw v. Stumpf*, 545 U.S. at 182 (emphasis added).

"The *Teague* bar to the retroactive application of new rules is not . . . jurisdictional." *Schiro v. Farley*, 510 U.S. 222, 228 (1994) (citing *Collins v. Youngblood*, 497 U.S. 37, 40-41 (1990)). Consequently, "a State can waive the *Teague* bar by not raising it." *Id.* at 229; *see also Godinez v. Moran*, 509 U.S. 389, 397 n.8 (1993). Given the State of Ohio's conscious abandonment of any possible *Teague* argument here,[3] we, like the Supreme Court, "do not apply the rule of *Teague v. Lane*

---

[3]Although the State of Ohio does not dispute its failure to raise an explicit *Teague* defense previously, it argues on remand that such an affirmative defense can be inferred from its argument in the district court that "Stumpf failed to set forth an actionable federal claim." We need not devote much time to such a proposition that, had it been advanced *by the petitioner* in a different context, would rightfully have been subject to a state motion to dismiss on the basis of the claim's unworkably general nature.

Furthermore, we note that the state was presented with numerous opportunities to advance a *Teague* defense yet chose not to do so. Even after Stumpf explicitly argued to the district court that *Teague* did not bar review of his argument that his due process rights were violated by the prosecution's use of inconsistent theories, (JA 1463) the state failed to suggest *Teague*'s applicability. Even in its supplemental brief and its reply brief to the district court on the validity of Stumpf's due process and inconsistent-

. . . to this case." *Bradshaw v. Stumpf*, 545 U.S. at 182. Instead, according Stumpf's serious allegations of constitutional deprivation the respect they deserve, we choose to address the merits of those charges.**[4]**

## C.  Due Process Claim

The Supreme Court has directed us on remand to clarify whether Stumpf is entitled to re-sentencing even if his convictions are constitutionally valid. *See Bradshaw v. Stumpf*, 545 U.S. at 187. In making that determination, we must decide whether the petitioner's due process rights were abrogated by the prosecution's insistence on arguing, during Stumpf's sentencing hearing, that Stumpf was the sole gunman who killed Mrs. Stout and, during Wesley's sentencing hearing, that Wesley was the sole gunman who murdered Mrs. Stout.

The principle is beyond dispute, both legally and logically, that there exists a "heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion)). *See also Oregon v. Guzek*, 546 U.S. 517, 525 (2006) (same); *Deck v. Missouri*, 544 U.S. 622, 632-33 (2005) ("stress[ing] the 'acute need' for reliable decisionmaking when the death penalty is at issue") (citing *Monge v. California*, 524 U.S. 721, 732 (1998) (citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978))). An erroneously-imposed prison sentence may always be commuted or otherwise shortened to ameliorate sentencing error. A sentence of death, once carried out, may not, of course, be undone. Basic principles of

---

theories arguments, the state did not discuss or even mention *Teague*. *See* JA 1444-50; 1472-77. Even in its brief on the same issue to this court, even after we held that the state's inconsistent theories violated Stumpf's due process rights and that such a violation "mandate[d] that Stumpf's . . . sentence be set aside," *Stumpf v. Mitchell*, 367 F.3d at 616, even in its brief petitioning for rehearing of our decision, even in its petition for certiorari to the Supreme Court, even in its substantive brief before the Supreme Court, the state did not take the opportunity even to cite to *Teague*. Presented with such a scenario, we conclude without hesitation that the State of Ohio knowingly and purposefully waived its right to avail itself of a *Teague* defense and may not now walk away from its history of conscious inaction with a twelfth-hour gambit designed to forestall review of the merits of the habeas claim in this case. The stakes are simply too high.

    **[4]**Given our resolution of the state's *Teague* claim, we need not now decide whether a determination that a due process violation has occurred in this instance implicates a "new constitutional rule[ ] of criminal procedure."

justice and fairness thus mandate that every effort be undertaken to ensure the reliability of the capital-sentencing process. As Justice Brennan noted in his separate opinion in *Strickland v. Washington*, federal courts "have consistently required that capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding." 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part).

The Due Process Clause of the federal constitution guarantees to every criminal defendant the right to a fair trial. *See, e.g.*, *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 25 (1981). Indeed, "[a] fair trial in a fair tribunal is a basic requirement of due process." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).

In our earlier decision in this matter, we joined with other circuits "in finding that the use of inconsistent, irreconcilable theories to convict two defendants for the same crime is a due process violation." *Stumpf v. Mitchell*, 367 F.3d at 611. In doing so, we cited with approval *Smith v. Groose*, 205 F.3d 1045 (8th Cir. 2000), for the proposition that such inconsistencies "render[ ] convictions unreliable, given that '[the s]tate's duty to its citizens does not allow it to pursue as many convictions as possible without regard to fairness and the search for truth.'" *Stumpf v. Mitchell*, 367 F.3d at 612 (quoting *Smith*, 205 F.3d at 1051). We also quoted the following portion of the Ninth Circuit's decision in *Thompson v. Calderon*, 120 F.3d 1045, 1059 (9th Cir. 1997) (*en banc*), *vacated on other grounds*, 523 U.S. 538 (1998), which in turn quoted from a special concurring opinion by Judge Clark of the Eleventh Circuit in *Drake v. Kemp*, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring):

> [T]he prosecutor's theories of the same crime in the two different trials negate one another. They are totally inconsistent. This flip[-]flopping of theories of the offense was inherently unfair. Under the peculiar facts of this case the actions by the prosecutor violate the fundamental fairness essential to the very concept of justice. . . . The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for the truth.

The Supreme Court disagreed with our conclusion that the due process violation undermined Stumpf's conviction because, under Ohio law, "the precise identity of the triggerman was immaterial to Stumpf's conviction for aggravated murder." *Bradshaw v. Stumpf*, 545 U.S. at 187. As a result, the conflicting theories presented to the Stumpf factfinders and to the Wesley factfinders regarding which of the two men shot and killed Mrs. Stout on that fateful May 1984 day in no way affected the reliability of the determination that Stumpf was guilty of aggravated murder in her death.

But, our constitutional duty to ensure the reliability of capital sentencing – to ensure that all individuals are accorded due process before our state and federal judicial institutions – is not relieved by the Supreme Court's limited ruling in *Bradshaw v. Stumpf*. Indeed, the Supreme Court itself recognized in its opinion that "[t]he prosecutor's use of allegedly inconsistent theories may have a more direct effect on Stumpf's sentence . . . for it is at least arguable that the sentencing panel's conclusion about Stumpf's role in the offense was material to its sentencing determination." *Id.*

Our examination of the voluminous appellate record leads us to the inescapable conclusion that it is much more than "arguable" that Stumpf's sentencers were swayed by the ultimately-unreliable presentation by the representative of the State of Ohio. In fact, we are convinced that it would amount to nothing short of complete abdication of our sworn responsibilities to ensure the reliability of capital sentencing were we to presume that the state's later-recanted argument that the petitioner was the triggerman in Mrs. Stout's murder did not affect the panel's sentencing decision. Our confidence in our conclusion is buttressed not only by common sense, but also by the words of the various individuals actually involved in the sentencing decision.

For example, during Stumpf's sentencing hearing, the panel of state-court judges found "beyond a reasonable doubt that the defendant was the principal offender in Count One of the Indictment."[5] App. 2182. In fact, when ruling upon Stumpf's petition for a writ of habeas corpus, the district court explained that "the trial court cited its finding

---

[5]Count One of Stumpf's indictment alleged that Stumpf "did purposely cause the death of another person, to wit: Mary Jane Stout . . . ." App. 210.

that petitioner was the actual shooter as a reason, *and a very substantial reason*, why the aggravating circumstance outweighed the mitigating factors." *Stumpf v. Anderson*, No. C-1-96-668, 2001 WL 242585, at *48 (S.D. Ohio Feb. 7, 2001) (emphasis added). Of course, had the panel also had the opportunity to factor into its decision the certitude with which the State of Ohio argued during *Wesley's* trial that *Wesley* was the principal offender, it would have been hard-pressed to reach such a doubt-free conclusion.

Indeed, during the hearing on Stumpf's motion to withdraw his guilty plea following his conviction and sentencing, one of the three judges who sentenced Stumpf to death noted, "[I]f we had not been satisfied that Stumpf was, in fact, the trigger man, the principal offender, and we were satisfied that he was, in fact, an aider and abettor, that may very well have had an effect upon this Court's determination of whether the death penalty should follow. I'm not saying it would, but it's possible." App. 2600. Unfortunately, that uncertainty can never be dispelled because one of the three judges who served on Stumpf's sentencing panel died prior to that hearing on the motion to withdraw the plea. *See* App. 2579-80. Because Ohio law requires unanimity when a three-judge panel determines whether aggravating circumstances outweigh mitigating factors beyond a reasonable doubt, *see* Ohio Rev. Code Ann. § 2929.03 (D)(3), if the missing judge in Stumpf's case had shared that view with conviction, based on new information concerning the state's theory of the case, it is evident that Stumpf would not have been sentenced to death.

We are cognizant of the fact that, at the time of Stumpf's trial, there was no evidence that the prosecutor was aware that Eastman's testimony would implicate Wesley as the triggerman in Mrs. Stout's murder. Nevertheless, although the state argued during Wesley's trial in support of Eastman's credibility and against the plausibility of Wesley's account of the murder, during Stumpf's motion to withdraw his guilty plea, the same prosecutor employed a much different tactic. In that later hearing, the state once again argued that Stumpf was the principal offender and this time sought to impugn the very testimony of Eastman on which it had relied during Wesley's trial.

If we are to take seriously the responsibility of ensuring reliable sentencing determinations in capital cases, we cannot allow the prosecution to play so fast and loose with the facts and with its theories. To allow a prosecutor to advance irreconcilable theories without adequate explanation undermines confidence in the fairness and reliability of the trial and the punishment imposed and thus infringes upon the petitioner's right to due process.

We are not alone in reaching such conclusions. In *In re Sakarias*, 106 P.3d 931, 944 (Cal. 2005), for example, the California Supreme Court held that the "use of irreconcilable theories of . . . culpability, unjustified by a good faith justification for the inconsistency, is fundamentally unfair, for it necessarily creates the potential for – and, where prejudicial, actually achieves – . . . increased punishment on a false factual basis for one of the accuseds." Likewise, in *Jacobs v. Scott*, 513 U.S. 1067 (1995), Justice Stevens, dissenting from the denial of stay of execution in a capital case wrote:

> [F]or a sovereign State represented by the same lawyer to take flatly inconsistent positions in two different cases – and to insist on the imposition of the death penalty after repudiating the factual basis for that sentence – surely raises a serious question of prosecutorial misconduct. In my opinion, it would be fundamentally unfair to execute a person on the basis of a factual determination that the State has formally disavowed.

Concurring in the Supreme Court's decision in the present case, Justice Souter also noted that:

> [When Stumpf] challenged his death sentence (along with his conviction) on the basis of the prosecution's position in the Wesley case . . . the State did not repudiate the position it had taken in the codefendant's case, or explain that it had made a mistake there. Instead, it merely dismissed the testimony of the witness it had vouched for at Wesley's trial . . . and maintained that Stumpf's death sentence should stand for some or all of the reasons it originally argued for its imposition. At the end of the day, the State was on record as maintaining that Stumpf and Wesley should both be executed on the ground that each was the trigger-man, when it was undisputed that only one of them could have been.

*Bradshaw v. Stumpf*, 545 U.S. at 189 (Souter, J., concurring) (citation omitted).

As we stated in our prior opinion in this case, "there is more than a reasonable probability that the three-judge panel would not have sentenced Stumpf to death had the prosecution not employed inconsistent and irreconcilable theories." *Stumpf v. Mitchell*, 367 F.3d at 617. In fact, even the Ohio Supreme Court has recognized that, under Ohio law, not being the principal offender is normally a "powerful mitigating factor," and that "[v]ery few death sentences have been approved against persons who were not the principal offender." *State v. Green*, 738 N.E.2d 1208, 1224 (Ohio 2000) (citation omitted).

The state contends, nevertheless, that both Stumpf's and Wesley's sentencing proceedings *were* reliable because Wesley's jury, in sentencing Wesley to life in prison with the possibility of parole after 20 years, obviously disbelieved Eastman's testimony regarding Wesley's role in Mrs. Stout's murder. According to the state, that jury determination justifies the harsher penalty imposed upon Stumpf. The argument ignores, however, the very real probability that the sentencing decision rendered by Wesley's jury was influenced in large part by the jury's knowledge that the prosecutor had already argued that *Stumpf* was the principal offender and had already convinced a three-judge panel to impose the death penalty upon Stumpf as a result. In short, Wesley's jury was driven not so much by its disbelief of Eastman as by its unwillingness to imagine that the prosecution would engage in such a flippant, macabre game of chance with people's lives.

In our system of justice, criminal prosecutors bear special responsibility in ensuring the fairness of all proceedings. As noted 76 years ago by the Supreme Court:

> [Because the prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer . . ., [i]t is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate method to bring about one.

*Berger v. United States*, 295 U.S. 78, 88 (1935). Consequently, "[a]lthough the prosecutor must prosecute with earnestness and vigor and 'may strike hard blows, he is

not at liberty to strike foul ones.'" *Smith*, 205 F.3d at 1049 (quoting *Berger*, 295 U.S. at 88).

Here, the actions of the State of Ohio in the Stumpf and Wesley sentencing proceedings charged at least to the line separating hard blows from foul blows. Whether the prosecutor in the two cases actually crossed that line is not for us to decide in this opinion. Rather, we need only determine whether such double-dealing likely affected the sentencing decision in Stumpf's case. The state argues "that Stumpf's death sentence did not depend on proof that he actually killed Mrs. Stout." Appellee's Br. on Remand at 17. We must conclude, however, that it did. Stumpf's sentencers, persuaded by the first of the prosecution's contradictory arguments, found "beyond a reasonable doubt" that Stumpf was the principal offender and, as such, deserved to be put to death. The fact that the State of Ohio was later able to argue in Wesley's sentencing hearing that such was not the case after all, yet still object to any effort to reduce Stumpf's punishment, either casts grave doubt on the reliability of Stumpf's sentence or is evidence of an attempt by the prosecution to perpetrate a fraud on the state court. We choose to believe that it is the former and thus hold that the petitioner's due process rights were violated in this case.

The state insists, however, that even if a constitutional violation occurred in this matter, Stumpf cannot establish that he was prejudiced by it. In reaching that conclusion, the state relies upon the fact that the Supreme Court of Ohio, "[i]n independently determining that Stumpf's death sentence was appropriate, . . . specifically considered the testimony of Wesley's cellmate during Wesley's trial." Appellee's Br. on Remand at 20 (citing *State v. Stumpf*, 512 N.E.2d 598 (1987)). Likewise, the district court, in denying habeas relief to Stumpf, concurred that "the Supreme Court of Ohio cured any potential flaw by independently determining that the aggravating circumstance outweighed the mitigating factors, even in light of the testimony by Wesley's cellmate." *Stumpf v. Anderson*, 2001 WL 242585, at *48. These attempted justifications miss the point, however. The relevant question now before us is not what weight should be given to Eastman's testimony during Wesley's sentencing hearing, but rather whether the

prosecution's inconsistent theory and arguments that Stumpf was the principal offender -- even though evidence and testimony indicated that he might not be -- influenced the decision of Stumpf's sentencers to impose a penalty of death. Again, the record before us requires us to answer with a resounding "yes."

## *CONCLUSION*

For the reasons set forth above, we conclude that Stumpf's due process rights were violated by the prosecution's arguments leaving the impression with Stumpf's sentencers that the petitioner was the principal offender in the murder of Mrs. Stout, even though the state had evidence and a belief that co-defendant Wesley was actually the triggerman in Mrs. Stout's murder. Because all indications are that the three-judge panel that sentenced Stumpf to death would not have done so had the state not persisted in its efforts at duplicity, we also hold that the petitioner was prejudiced by that constitutional violation. We thus once again REVERSE the judgment of the district court and REMAND this matter for issuance of a conditional writ of habeas corpus unless the State of Ohio elects to accord Stumpf a new sentencing hearing within 90 days of the issuance of this opinion.

---

**DISSENT**

---

BOGGS, Circuit Judge, dissenting.   The majority has resurrected a new substantive right of their own invention, which made its first appearance in *Stumpf v. Mitchell*, 367 F.3d 594 (6th Cir. 2004), *vacated by Bradshaw v. Stumpf*, 545 U.S. 175 (2005), and apparently had all along been lurking somewhere within the Fourteenth Amendment.  In its current iteration, the new right protects a convicted murderer from being sentenced to death where mitigating evidence (i.e., evidence that does not undermine the murder conviction itself but that might have counseled towards a more lenient sentence) discovered *after* sentencing is *later* used by the prosecution against a *different* defendant.   Notably, the due process violation is not that mitigating evidence exists that is later discovered, which would not by itself offend the Constitution, *Noel v. Norris*, 322 F.3d 500, 504 (8th Cir. 2003); *see Herrera v. Collins*, 506 U.S. 390, 400 (1993),[1] but, curiously, that the newly discovered evidence is later used by the prosecution against a different defendant.   Somehow, that purely later conduct retroactively renders the earlier sentence unconstitutional.

Consider a hypothetical case.  B is killed in a horrifying fashion.  A is tried for the murder of B, is convicted, and due to the terrible nature of the crime, is sentenced to death.  A's trial is not merely in compliance with constitutional standards, but is a model trial.  The most scrutinizing criminal lawyers available comb through the trial record in search of some plausible legal claim to bring on appeal, but they find nothing, and A's sentence is correctly affirmed on direct review.  The majority's new right has no import at this time.  Many years later, a witness comes forward with new information—the witness explains that C and A killed B in concert, and that C's conduct was more vile.

---

[1] Although new evidence may be used to substantiate other constitutional claims, such as prosecutorial misconduct in the form of knowingly using perjured testimony, the existence of new evidence of innocence, or of "innocence of the death penalty" as in this case, is not in and of itself a constitutional violation.  In any case, Stumpf's new evidence does not speak to any problematic conduct that occurred at his trial, as in the ordinary case, but rather at Wesley's trial, when the prosecutor adopted a theory based on the new evidence.

Still, the majority's new right has no import.  But wait—the prosecutor acts on the witness's testimony and tries C for B's murder, arguing that, even though A was already convicted of the murder, it was in fact C that committed the most horrifying aspects of the crime.  Sure, the jury acquits C, but that is apparently besides the point.  Now, the majority's new right finally jumps into action.  The prosecutor in C's trial has denied A—yes, A—the right to be sentenced fairly, in violation of the Due Process Clause of the Fourteenth Amendment.

I do not agree with that application of the Constitution in the slightest,[2] and as I explained in my first dissent in this case, I believe that the out-of-circuit cases that the majority relies upon for its new rule are readily distinguishable.  *Stumpf v. Mitchell*, 367 F.3d at 618–22 (Boggs, J., dissenting).  I would therefore affirm the decision of the district court dismissing Stumpf's petition for a writ of habeas corpus.

If ever there were a case in which to adopt the majority's new right, this is not it.  Indeed, the majority's opinion in many places obfuscates the timeline of what happened here, and argues as if the state withheld information from the Ohio courts, or argued factually inconsistent theories at the original sentencing or at the same time.  That is simply not correct.  Stumpf's trial and sentencing were based on all the evidence then available, and there was no error in those proceedings.[3]  Subsequent to that time, new evidence came to the attention of the state in the form of a statement by Eastman, a cellmate of co-defendant Wesley.  Such statements are always viewed with some skepticism, and in any case, there is no claim that the state was responsible for bringing

---

[2]I note that the majority's repeated references to a federal court's obligation to ensure accuracy, maj. op. at 12, 13, 15, in the context of death-penalty habeas appeals simply has no support in Supreme Court jurisprudence.  We do not sit to indulge our own sense of justice as to how state-court proceedings should come out.  We do not have a freestanding license to decide how the strength of a case appeals to us without reference to existing laws and procedures.  It is true that Justice Marshall on occasion, dissenting alone, used such a phrase, *see, e.g. Barefoot v. Estelle*, 463 U.S. 880, 938 (1983), but that vague statement, pregnant with the outcome preferences of the judges charged with implementing it, is appropriately not the law.

[3]*See Bradshaw v. Stumpf*, 545 U.S. at 186–87 (unanimously reversing, without argument, the majority's holding invalidating Stumpf's guilty plea and its holding that inconsistent prosecutorial theories invalidated his conviction, and remanding to consider whether the inconsistent theories could have affected Stumpf's death sentence).

forth this evidence, or that the state was in any way derelict in its duties in not discovering it earlier.

Clearly, there is a timeline problem for the majority—how did the prosecution violate the Constitution at Stumpf's trial with respect to evidence that did not yet exist? The majority attempts to deal with this issue by focusing in part on the prosecutor's actions in response to Stumpf's post-trial motion for resentencing, which occurred after Wesley's trial. The majority faults the prosecutor for apparently making an argument that they disapprove of (by ostensibly trying to have it both ways) rather than making the argument that they apparently would approve of and simply confessing that he was wrong at Wesley's trial. *See* maj. op. at 15. But this is not a situation where the prosecutor misled or bamboozled a jury. Rather, the prosecutor made an argument, referencing all available evidence, to a panel of judges. The state did not hide the ball, and the judges were not bamboozled. I know of no case or principle in which an otherwise unblemished prosecution can be held to have violated the Constitution because a federal appellate panel disapproves of the nature of the prosecutor's oral arguments to a judge at a post-trial proceeding.

The majority's opinion here emphasizes the dilemma in which the state was placed and the nature of today's ruling. If the state had simply ignored the evidence, it apparently would have now been in no difficulty. *See Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2319–20 (2009) (no *Brady* obligation to disclose exculpatory evidence discovered post-trial). Indeed, the majority is apparently clear that, if the prosecution had simply decided not to present the cellmate evidence against Wesley and achieved the same life sentence that it did here, there would be no inconsistency, and thus no due-process violation. *See* maj. op. at 15, 18. That concession emphasizes the bizarro nature of the majority's argument that you can somehow violate the rights of A, who has had a meticulously fair proceeding, by the decision that you make as to how to proceed in the trial of C.

The inconsistent-theory cases raised by the majority virtually all relate to a state's contemporaneous presentation of inconsistent theories that could have an effect

on the trial at issue, and that could result in factually impossible inconsistencies impacting both defendants. Here, the alleged violation is how the prosecutor chose to deal with the *later-discovered* evidence, in a wholly separate proceeding. It is much closer to the alleged inconsistency in our case of *Getsy v. Mitchell*, 495 F.3d 295 (6th Cir. 2007), where we rejected, en banc, a similar argument. At bottom, what happened here is that some additional evidence, the statement of the cellmate, came to light after the proceedings were concluded. That new material was presented in a proper way to the courts of Ohio, was litigated by Stumpf in the proper order, and Stumpf lost.

Further, even if I were to agree that the prosecutor[4] somehow retroactively violated Stumpf's constitutional rights, I fail to see how Stumpf was prejudiced by that violation. Once the Eastman testimony became available to him, Stumpf went back to the same Ohio panel that sentenced him.[5] The particulars of Eastman's testimony, and of its handling at Wesley's trial, were all fully explored on the record in Wesley's trial, and were then placed before the Ohio panel hearing Stumpf's motion for resentencing based on that new evidence. That panel had the power to undo Stumpf's death sentence, but declined to do so, even after being fully informed of all of the facts, including the ones that the majority finds dispositive as to the prosecutor's action.

The majority emphasizes, at page 14, a statement by one judge, made during oral argument on Stumpf's motion for resentencing, that "if [the panel] had not been satisfied that Stumpf was, in fact, the trigger man, the principal offender, and we were satisfied that he was, in fact, an aider and abettor, that may very well have had an effect upon this Court's determination of whether the death penalty should follow. I'm not saying it would, but it's possible." It should first be emphasized just how qualified that statement

---

[4]Because Wesley's trial was wholly subsequent to and unconnected to Stumpf's, it is simply fortuitous that the same prosecutor was involved. The second trial could have just as easily been prosecuted by a different person or even, under some circumstances, in a different jurisdiction. In any case, I fail to see how the prosecutor's judgment at Wesley's trial, which was based upon previously unavailable evidence, can somehow impeach his earlier motives or actions and render the original, previously constitutional, proceeding unconstitutional.

[5]The panel was comprised of two of the three original judges, the third having died in the interim. The two judges proceeded to hear Stumpf's motion for resentencing, premised on the new evidence, and they agreed that, so long as they were unanimous, there was no reason to bring in a third judge. Stumpf does not challenge that decision here.

is—the judge merely expressed orally, in the course of a discussion with the prosecutor, the possibility that the panel *might* have declined to impose the death penalty *if* it were satisfied that Stumpf was not the principal offender. Indeed, the judge simply emphasized the prosecutor's framing of the issue (i.e., whether Stumpf was the principal offender and, if not, whether the panel would still have imposed the death penalty), and in no way indicated a leaning as to how the panel felt about the matter. That statement does not appear in any way in the court's written decision and order, indicating that the panel either concluded, after deliberation, that it *was* satisfied that Stumpf was the principal offender or, alternatively, that a contrary finding would *not* have made a difference in its decision to impose the death penalty. The panel had full opportunity and ability to state any skepticism as to its earlier action, or to indicate that it had some belief in the statement by the cellmate, and it did not do so. Thus, the majority's speculation at pages 13 through 15 as to its view of the evidence is simply unsupported.

Certainly, the panel had the same options that it did at the original hearing. The panel could have concluded either that (1) Stumpf was the killer, (2) Wesley was the killer, or (3) either way, Stumpf deserved the death penalty for his involvement in this heinous crime, for which he was criminally responsible even if Wesley pulled the trigger. Notably, the panel also had *inculpatory* evidence that it did not have before, in the form of Wesley's trial statements that supported the prosecution's view of events—that Stumpf was the person who killed Mary Jane Stout. And, of course, it is worth mentioning the fact that the Eastman testimony was not credited by the Wesley jury, which apparently did not believe the cellmate's version of the facts, or, in any event, did not find it so compelling as to sentence Wesley to death. In light of the Ohio panel's review of that evidence, and its decision to leave Stumpf's death sentence intact, I do not see how Stumpf has demonstrated *any* probability that *he* was prejudiced by the prosecutor's decision to present the new evidence and argue a new theory at *Wesley's* trial.

In addition, even if I were to share the majority's vision of the Fourteenth Amendment as applied to this case, *Teague v. Lane* clearly bars the retroactive

application of the majority's new constitutional right to Stumpf. *See* 489 U.S. 288, 306 (1989). Notably, all of the cases that the majority relies upon for its rule were decided long after Stumpf's conviction became final in 1988, when the Supreme Court denied certiorari. *See Stumpf v. Ohio*, 484 U.S. 1079. Accordingly, "the result was not dictated by precedent existing at the time the defendant's conviction became final," and the rule is new for purposes of *Teague*. *Teague*, 489 U.S. at 301. Further, neither of *Teague*'s two exceptions—new limitations on criminal lawmaking authority and new "watershed" rules of criminal procedure—apply here. *DeCastro v. Branker*, 642 F.3d 442, 458 & n.4 (4th Cir. 2011).

Although their conclusion conflicts with the views of the only two Justices to consider the issue, pursuant to Circuit precedent,[6] I agree with the majority that the state has waived its *Teague* defense. *Bradshaw v. Stumpf*, 545 U.S. at 191 (Thomas, J., concurring) ("The Court's opinion does not preclude the State from advancing [a *Teague*] defense[] on remand in support of Stumpf's death sentence."). However, whether we *must* apply *Teague* is only the threshold inquiry. As the Supreme Court has held, "a federal court may, but need not, decline to apply *Teague* if the State does not argue it." *Horn v. Banks*, 536 U.S. 266, 271 (2002) (quoting *Bohlen*, 510 U.S. at 389). Accordingly, after determining that the state waived *Teague* and we are not *required* to apply it, step two is to consider whether we *should* apply *Teague*.

On that point, the majority's analysis is unconvincing. The majority suggests that the "stakes are simply too high" to allow the state's *Teague* defense "to forestall review of the merits" of Stumpf's due-process claim. Maj. op. at 11 n.3. That, however, is flatly inconsistent with *Teague* itself. The very holding of *Teague* is that courts must avoid reaching the merits where, such as here, the petitioner seeks "[a]pplication of constitutional rules not in existence at the time [his] conviction became final." *Teague*, 489 U.S. at 309, 316. Accordingly, "forestalling review" would not undermine the application of *Teague* not just in this case, but in all cases. Further, one of the Court's

---

[6]In a three-opinion split decision, a panel of this court held that a state waives its *Teague* defense by failing to raise it before the district court. *Lyons v. Stovall*, 188 F.3d 327, 345–46 (6th Cir. 1999) (Gilman, J., concurring); *id*. at 347–48 & n.1 (Moore, J., dissenting).

primary considerations in adopting *Teague*'s nonretroactivity rule was that similarly situated defendants should be treated similarly. *Id*. at 315. Accordingly, a determination in a particular case that, for one reason or another, "the stakes are too high," is no reason to ignore *Teague*. That conclusion is reinforced here, where the majority's rule will have only the most sporadic impact. Significantly, the majority's rule is not clearly established Supreme Court precedent, *see* 28 U.S.C. § 2254(d), and post-AEDPA habeas petitioners are therefore unable to avail themselves of it, regardless of whether the state properly raised *Teague*.

Because the concerns motivating *Teague* do not depend on whether the state promptly raises the issue, I agree with Judge Gilman's concurrence in *Lyons*, in which he argued that "a federal court should presumptively apply the *Teague* analysis *sua sponte* whenever a defendant tries to raise a new constitutional rule for the first time on collateral review." 188 F.3d at 346; *accord id*. at 339 n.8 (Clay, J., concurring) ("[I]rrespective of the state's preservation of its *Teague* defense, based upon the new rule proposed by Petitioner, if ever there was a time for this Court to raise and decide a *Teague* claim *sua sponte*, surely it is here."). In this case, where there is no indication that the state strategically sought to "sandbag" this court, *see id*. at 346, where both parties fully briefed and argued the issue, *see Albrecht v. Horn*, 485 F.3d 103, 120 (3d Cir. 2007), and where we are more than capable of making a reasoned judgment on the issue, *see Goeke v. Branch*, 514 U.S. 115, 118 (1995), I would hold that *Teague* should apply, even though I must agree with the majority that the state waived the argument.

For these reasons, I respectfully dissent, both on the merits and pursuant to *Teague*'s nonretroactivity principle.[7]

---

[7]This case was originally heard on December 11, 2002. After a decision on April 28, 2004, and a subsequent trip to the United States Supreme Court, it was heard again on July 26, 2007—*four years ago*. During that interval, the state has filed two motions to expedite a decision, one on August 6, 2010, and a second on June 2, 2011. As is obvious, in a death penalty appeal, a failure to decide has the same short-run effect as a decision in favor of the condemned—it prevents his execution.

In the absence of a decision by the panel, there is no process allowing for the court as a whole to take the decision en banc. Thus, the only remedy available (from the Sixth Circuit) to a litigant in the position of the State of Ohio here is the purely hortatory motion that the state filed here—a motion that, like the very decision that it seeks to expedite, is also solely within the power of the panel and cannot be taken en banc (if it ever could be) in the absence of a decision on that motion. The only remedy available under current rules is a petition to the Supreme Court for certiorari before judgment. *See* Sup. Ct. R. 11.