MARTHA CRAIG DAUGHTREY, Circuit Judge,
dissenting.
Because I believe that John David Stumpf did not receive a fair sentencing hearing but is, rather, the victim of prosecutorial gamesmanship serious enough to violate his right to due process, I am compelled to dissent from the majority’s opinion. In my judgment that opinion completely fails to recognize and to address the arbitrary, unreliable aspects of Stumpfs sentence, resorting instead to a recitation of legal platitudes that are presumptuous in their certitude, yet wholly without support in the record.
*755 The majority opinion speaks in terms of broad jurisprudential truths, noting, for example, that “[t]he Due Process Clause prohibits the state from ‘depriving] any person of life, liberty, or property, without due process of law[,]’ U.S. Const, amend. XIV, § 1.” That proposition is beyond dispute. Similarly, the opinion correctly recognizes Supreme Court precedent holding that “[a]s applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice.” See Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941). Where the majority goes astray, however, is in the application of these settled legal principles to the facts before us and in its failure to concede that the arbitrariness that permeated the Stumpf and Wesley proceedings necessarily denied that fundamental fairness.
In the 40 years since the Supreme Court’s landmark decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), courts have accepted as axiomatic “that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice.” Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Furthermore, we have been admonished not to “permit this unique penalty to be ... wantonly and ... freakishly imposed.” Furman, 408 U.S. at 309-10, 92 S.Ct. 2726 (Stewart, J., concurring). To the contrary, when considering “a matter so grave as the determination of whether a human life should be taken or spared,” we are directed to take all necessary steps “to minimize the risk of wholly arbitrary and capricious action.” Gregg, 428 U.S. at 189, 96 S.Ct. 2909. See Caldwell v. Mississippi 472 U.S. 320, 323, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (recognizing “heightened need for reliability in the determination that death is the appropriate punishment in a specific case” (internal quotation marks and citation omitted)).
But rather than take these admonitions to heart, the majority glibly asserts that the actions undertaken and the arguments espoused by the prosecution throughout Stumpfs and Wesley’s trials did not risk “arbitrary or capricious action” because the decisions and contentions of the State of Ohio were at all times “consistent and appropriate.” In fact, the majority goes so far as to make such explicit statements as: “all of the available evidence was at all times presented to all of the courts involved”; “[njothing misleading happened here”; “[njothing deceitful”; “[tjhe prosecution did not present a different and incomplete set of facts in support of different theories of culpability for the same crime”; and “there is nothing foul about the prosecutor’s conduct here.” Apparently by repeating to itself such statements, the majority is able to reach its fanciful conclusion that “[tjhe prosecutor’s allegedly' inconsistent arguments do not violate the Due Process Clause.” (Emphasis mine.)
It must appear to the reader, as it did to me, that I received an appellate record radically different from the one reviewed by the majority. In fact, my reading of the record led me to the inescapable conclusion, not that “[njothing misleading happened here” but, to the contrary, that the prosecution in these proceedings continually misled the factfinders; that the prosecution was, if not deceitful, at least willing to play fast and loose with whatever facts would best serve its purposes; and that it most definitely presented “a different and incomplete set of facts in support of different theories of culpability for the same crime.” In the end, however, it became clear that the record I reviewed actually conformed to the record before the United States Supreme Court in Bradshaw v. Stumpf, 545 U.S. 175, 125 S.Ct. 2398, 162 L.Ed.2d 143 (2005). Indeed, in his concurring opinion, which was joined by Justice *756 Ginsburg, Justice Breyer summarized the issues now before this court by reference to an interpretation of underlying facts wholly at odds with that propounded in the majority opinion. That concurrence explained:
I understand Stumpf to claim that it violates the basic due process standard, barring fundamentally unfair procedure, to allow his death sentence to stand in the aftermath of three positions taken by the State: (1) at Stumpfs sentencing hearing; (2) at the trial of Stumpfs eodefendant, Clyde Wesley; and (3) in response to Stumpfs motion to withdraw his guilty plea in light of the State’s position at the Wesley trial. At the hearing on Stumpfs sentence, the State argued that he was the trigger-man, and it urged consideration of that fact as a reason to impose a death sentence. The trial court found that Stumpf had pulled the trigger and did sentence him to death, though it did not state that finding Stumpf to be the shooter was dispositive in determining the sentence. After the sentencing proceeding was over, the State tried the codefendant, Wesley, and on the basis of testimony from a new witness [,] argued that Wesley was in fact the triggerman and should be sentenced to death. The new witness was apparently unconvincing to the jury, which in any event was informed that Stumpf had already been sentenced to death for the crime; the jury rejected the specification that named Wesley as the triggerman, and it recommended a sentence of life, not death. Stumpf then challenged his death sentence (along with his conviction) on the basis of the prosecution’s position in the Wesley case. In response, the State did not repudiate the position it had taken in the codefendant’s case, or explain that it had made a mistake there. Instead, it merely dismissed the testimony of the witness it had vouched for at Wesley’s trial and maintained that Stumpfs death sentence should stand for some or all of the reasons it originally argued for its imposition. At the end of the day, the State was on record as maintaining that Stumpf and Wesley should both be executed on the ground that each was the triggerman, when it was undisputed that only one of them could have been.
Id. at 188-89, 125 S.Ct. 2398 (emphasis added) (citations omitted).
Yet, even in light of Justice Breyer’s succinct recapitulation of the prosecution’s legerdemain, the majority continues to perform the mental gymnastics necessary to convince itself that Stumpfs death sentence was fundamentally fair and was not imposed arbitrarily. Try as I might, however, I cannot contort the straightforward sequence of events in this matter to reach the conclusion reached by the majority.
At Stumpfs original sentencing hearing, held prior to the State of Ohio’s knowledge of Wesley’s confession to James Eastman, the panel of three state-court judges concluded that Stumpf should be put to death because the panel determined “beyond a reasonable doubt that [Stumpf] was the principal offender in [the murder of Mary Jane Stout].” (Emphasis added.) Indeed, as noted by the district court in denying Stumpfs request for issuance of a writ of habeas corpus, “the trial court cited its finding that petitioner was the actual shooter as a reason, and a very substantial reason, why the aggravating circumstance outweighed the mitigating factors.” Stumpf v. Anderson, No. C-1-96-668, 2001 WL 242585, at *48 (S.D.Ohio Feb. 7, 2001). Such a conclusion by the sentencing panel of judges was understandable in light of the evidence then before that panel. Although it is true that Stumpf consistently maintained, even at that early stage of the proceedings, that he was not the trigger- *757 man ultimately responsible for the murder of Mary Jane Stout, the three-judge panel was forced to determine whether to credit Stumpfs protestations or to agree with the prosecution’s view of the evidence then available. Thus, despite the very real possibility that Stumpf did not, in fact, fire the fatal shots that killed Ms. Stout, no due process violation can be said to have occurred at that time.
Nor can the prosecution be faulted for arguing during Wesley’s trial that it was then convinced that it was actually Wesley, and not Stumpf, who was the triggerman in the murder. It was not until after Stumpfs initial sentencing, and prior to Wesley’s trial, that the State of Ohio learned from Eastman that Wesley confessed to him that the fateful events of the day of the murder actually unfolded exactly as Stumpf had claimed. The prosecution cannot, therefore, be condemned for bringing Eastman’s testimony to the jury’s attention.
At the same time, the Wesley jury also cannot be faulted for concluding that Wesley was not the triggerman. Despite the prosecution’s arguments during Wesley’s trial that recently discovered evidence now pointed the finger of guilt at Wesley as the person responsible for firing the gun that killed Mary Jane Stout, the jurors were also informed by Wesley’s defense team that a panel of judges had previously determined that it was, in fact, Stumpf who was the triggerman and Stumpf who had been sentenced to death for the Stout murder. Thus, even after Wesley’s trial had concluded, Stumpf had no valid claim that the process by which he was sentenced to die had been tainted by any procedural unfairness.[1]
However, we are still debating the legality and constitutionality of Stumpfs sentence because Stumpf and his lawyers recognized the now-demonstrably false prosecution theory under which he first had been condemned to death. Stumpf thus sought resentencing from the three-judge panel that presided over the punishment phase of his trial. It was at that post-sentencing hearing that the State of Ohio undertook tactics that any reasonable person would by now conclude were unfair and violative of even the most basic conceptions of due process of law.
Having learned of Wesley’s jailhouse confession to Eastman, the supporting facts of which Eastman would have had no reason to know absent information from Wesley himself, the prosecution — indeed the very same prosecutor who obtained Stumpfs conviction- — had argued in support of, and vouched for, Eastman’s credibility during Wesley’s trial. Then, when Stumpf subsequently sought to overturn his death sentence on the basis of the position taken by the State of Ohio in Wesley’s trial, the same prosecutor once more argued that Stumpf deserved execution at the hands of the state because Stumpf was the triggerman. Again, as noted by Justice Breyer, “the State did not repudiate the position it had taken in *758 [Wesley’s] case, or explain that it had made a mistake there.” Bradshaw v. Stumpf, 545 U.S. at 189, 125 S.Ct. 2398 (Souter, J., concurring).
In a baffling effort to bolster its decision to turn a blind eye to the State of Ohio’s duplicity, the majority intimates that no due process violation occurred because prosecutors are permitted to argue alternative theories before juries and judges. No such alternative arguments were made in this case, however. The prosecutor did not argue at Wesley’s trial that either Stumpf or Wesley — one or the other — was the actual triggerman. Instead, as an officer of the court, the prosecutor elicited testimony that Wesley was the principal offender and, as such, was deserving of execution. Later, still operating as an officer of the court, the same prosecutor, without any explanation for repudiation of his prior position, returned to his original argument that sought to portray Stumpf as the triggerman. Such convenient flip-flopping by a government official sworn to uphold justice simply reeks of unfairness. In fact, the only rationale I can envision for the prosecution’s (and now the majority’s) acceptance of the legitimacy of such tactics is an unwavering commitment to a win-at-any-eost callousness that is directly at odds with our solemn oath to preserve and defend the Constitution of the United States.
The majority also attempts to legitimize the prosecution’s blatant opportunism in this matter by attributing to the judicial panel that ruled upon Stumpfs motion for resentencing the assumption that Eastman must not have been a credible witness at Wesley’s trial, given the fact that the jury spared Wesley from the death penalty. The bases for this shaky claim are the majority’s assertion that “[t]hree Ohio panels considered whether Stumpf deserved the death penalty after Eastman testified in Wesley’s trial,” and its conclusion that “neither Eastman’s testimony nor the prosecutor’s argument concerning it had a significant impact, much less a ‘substantial and injurious effect or influence,’ on the outcome of Stumpfs sentencing proceedings.” These justifications ring hollow. Indeed, the majority’s very formulation of its argument in this regard demonstrates its blindness to the true constitutional issues presented by Stumpfs challenge.
The fact that “[t]hree Ohio panels” found Eastman’s testimony to be of minimal credibility is completely irrelevant to the issue of whether Stumpfs due process rights have been compromised. The majority seeks to emphasize determinations of the weight of the trial and post-trial evidence but completely ignores what should be the true issue here: the integrity of the process by which arguments concerning Stumpfs death-worthiness were placed before those three panels. As stated previously, it comes as no surprise that the jury in Wesley’s trial chose not to credit Eastman’s testimony. After all, the State of Ohio was proffering testimony in that proceeding that contradicted directly the factual findings and legal determinations already made by three members of the state judiciary. Given that determination, it also would not be surprising that the panel of state judges did not alter its conclusion based upon the introduction of jailhouse testimony only.
In regard to that panel and its ruling on Stumpfs motion for resentencing, I marvel at the cavalier attitude with which the majority minimizes the importance of the fact that only two of the original three judges who sentenced Stumpf were able to state that the knowledge that Stumpf might not have been the triggerman would not have altered their belief that he was properly condemned to be executed. As was noted in our now-vacated panel opin *759 ion in Stumpfs appeal from the denial of his petition for habeas relief:
[Djuring the hearing on Stumpfs motion to withdraw his guilty plea following his conviction and sentencing, one of the three judges who sentenced Stumpf to death noted, “[I]f we had not been satisfied that Stumpf was, in fact, the trigger man, the principal offender, and [if instead] we were satisfied that he was, in fact, an aider and abettor, that may very well have had an effect upon this Court’s determination of whether the death penalty should follow. I’m not saying it would, but it’s possible.’ ”[2]
Stumpf v. Houk, 653 F.3d 426, 437 (6th Cir.2011). Just how likely such a reversal of the original sentence might have been will never be known, because one of the three sentencing judges died prior to the hearing on Stumpfs motion for withdrawal of his guilty plea and resentencing. Admittedly, the trial court’s ruling on the motion might not have changed even if the third judge had survived and found pause in the fact that the basis for the panel’s original sentencing decision had been severely undercut. Nevertheless, for the majority of this court to discount so completely the possible effect of Eastman’s testimony on the third sentencing judge is disingenuous.
What is even more surprising and disturbing is, once again, the utter disregard displayed by both the Ohio courts and the majority here for the crux of Stumpfs habeas claim. What is most relevant in this court’s review is not whether Eastman’s testimony at Wesley’s trial was more believable than the suppositions offered by the prosecution at Stumpfs trial. Rather, what is most relevant is whether it was blatantly unfair for the prosecutor in Wesley’s case to vouch for the credibility of Eastman and then intimate at the hearing on Stumpfs post-sentencing motion that the very same information elicited by the State of Ohio at Wesley’s trial became, without any intervening contrary information, completely unworthy of belief.
The majority is quick to dismiss Stumpfs claims of patent unfairness, stating cursorily that Supreme Court cases in which a prosecutor was found to have violated the Due Process Clause were distinguishable because, in those cases, “the prosecutor did something to subvert the very foundation of the trial, something that kept the factfinder from making a fully informed decision.” Interestingly, a thoughtful examination of Stumpfs habeas claim reveals that he is making an identical argument — “the prosecutor did something to subvert the very foundation of the trial, something that kept the factfinder from making a fully informed decision.” Moreover, Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967), Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), the cases upon which the majority relies, condemn exactly the type of prosecutorial misconduct that occurred in this case.
As noted by the majority, Miller involved a knowing misrepresentation of evidence by the state. In that case, the prosecutor represented to the jury, *760 through the testimony of an expert witness, that blood stains matching the victim’s blood type were found on an item of clothing recovered a mile from the crime scene. Miller, 386 U.S. at 3-4, 87 S.Ct. 785. As was later discovered, however, the prosecution was aware at the time of Miller’s trial that the stains were remnants of paint, not blood. Id. at 5-6, 87 S.Ct. 785. Holding that due process principles will not “tolerate a state criminal conviction obtained by the knowing use of false evidence,” the Supreme Court reversed the lower court’s denial of a writ of habeas corpus. Id. at 7, 87 S.Ct. 785.
The prosecutor in Stumpfs and Wesley’s proceedings was guilty of the same type of malfeasance. Either he suborned perjury in Wesley’s trial by presenting Eastman’s testimony that Wesley confessed to being the triggerman, or else the prosecutor later misrepresented the strength of Stumpfs motion to set aside his sentence' by refusing to admit to the egregious mistake made during Stumpfs original trial. By thus withholding from the reconstituted sentencing panel information regarding the state’s belief in the veracity of Eastman’s testimony, the prosecution in this case misrepresented evidence just as egregiously as did the prosecution in Miller.
In Mooney, the state presented testimony it knew to be perjured. Mooney, 294 U.S. at 112, 55 S.Ct. 340. Disapproving of such tactics, the Supreme Court noted that “safeguarding the liberty of the citizen against deprivation through the action of the state, embodies the fundamental conceptions of justice which lie at the base of our civil and political institutions.” Id. Thus, in Mooney, the actions of the prosecutor were found to undermine the basic tenets of due process.
The actions of the prosecutor in Stumpfs case did no less. One can only hope that Stumpfs prosecutor did not knowingly present false testimony to the Wesley jury. Even if he did not, however, given his arguments during the hearing on Stumpfs post-sentencing motion, the prosecutor misled that court by failing to emphasize the fact that new information had come to light that effectively exonerated Stumpf as the principal offender in the murder of Mary Jane Stout. Whether the chicanery of the prosecutor involved affirmative efforts to deceive the court or simply a passive refusal to correct known error is irrelevant. In either instance, acts were perpetrated by the state that left Stumpfs sentencing panel with a less-than-accurate impression of the extent of Stumpfs role in the murder at issue. Thus, by knowingly allowing the impression that Stumpf was the triggerman to go unchecked, Stumpfs prosecutor also intentionally misled the court and subverted the very underpinnings of our criminal justice system.
Finally, the majority asserts that the Supreme Court’s decision in Napue is not relevant to the issues presented in this habeas appeal — another instance in which the majority is simply off the mark. Napue stands for the proposition that due process is denied a criminal defendant when the prosecution “allows [false testimony] to go uncorrected when it appears.” Napue, 360 U.S. at 269, 79 S.Ct. 1173. According to the majority, because no “false testimony” was presented during Stumpfs proceedings, Napue cannot serve to buttress Stumpfs claims of a due-process denial. But, the majority’s reading of Supreme Court precedent is far too narrow. Obviously, a prosecutor’s failure to correct false testimony denies to a criminal defendant the right to a fair trial conducted in accordance with established tenets of fairness, honesty, and integrity. But, to allow a court to continue to rely upon unfounded information without correction by the prosecution, when the prosecutor knows that the basis for the court’s decision has been undermined by subsequent *761 revelations, is equally egregious. In either instance, the prosecutor is standing idly by while the truth, known by the prosecution, is obfuscated or ignored. I find it impossible to reconcile such a perversion of justice with any civilized conception of fairness and due process.
Nor can the result of Stumpfs state-court proceedings be justified by empty obeisance to the state courts’ determinations regarding the weight given to Eastman’s testimony during Wesley’s trial. As discussed previously, it is not surprising in the least that Wesley’s juxy chose not to credit Eastman’s testimony regarding Wesley’s role in the murder of Mary Jane Stout. After all, the jurors were informed during that trial that Stumpf had previously pleaded guilty to the murder and that a panel of three judges had already determined that Stumpf should be sentenced to death, presumably as the principal offender.
In any event, the consideration given to the weight of Eastman’s testimony against Wesley (not Stumpf) ultimately is irrelevant to a determination of the legitimacy of the process by which Stumpfs sentence was ratified — by state-court judges, the district court in this habeas litigation, and this court on appeal. No concept of fair play or justice with which I am familiar would countenance the blatant gamesmanship now condoned by the majority. Simply to describe — once again — the actions taken by the prosecution throughout the proceedings against Stumpf is to demonstrate their manifest unfairness. At Stumpfs original sentencing hearing, the State of Ohio, without the benefit of any eyewitness testimony proving that Stumpf was the triggerman, argued forcefully that Stumpf should be put to death because he fired the fatal shots that killed Mary Jane Stout. Later, having been informed that Wesley confessed to Eastman that it was indeed Wesley who took the victim’s life, the prosecutor vouched for the truth of Eastman’s account and argued that Wesley should be executed as the triggerman as well. The fact that Wesley’s jxxry rejected the state’s theory did not deter the prosecution, however. Rather, despite having lately become convinced that Wesley fired the fatal shots and, indeed, having claimed so in a court of law, the prosecutor refused to stand by that position when faced with the possibility that Stumpf would then be removed from death row. Instead, the prosecutor deliberately failed to clear the mistaken impression that two of the three original sentencing judges held regarding Stumpfs culpability.
The inherent and fundamental unfairness of such overt duplicity was recognized in a dissent from the Supreme Court’s decision to deny a stay of execution and a writ of certiorari in Jacobs v. Scott, 513 U.S. 1067, 115 S.Ct. 711, 712, 130 L.Ed.2d 618 (1995). Writing separately, and joined by Justice Ginsburg, Justice Stevens claimed forcefully:
[F]or a sovereign State represented by the same lawyer to take flatly inconsistent positions in two different cases— and to insist on the imposition of the death penalty after repudiating the factual basis for that sentence — surely raises a serious question of prosecutorial misconduct. In my opinion, it would be fundamentally unfair to execute a person on the basis of a factual determination that the State has formally disavowed.
Clearly, the conduct of the State of Ohio in this matter is eerily similar. What made the state’s conduct in the present case even more egregious and more fundamentally unfair than what occurred in Jacobs, however, was the juxtaposition of the State of Ohio’s refusal to adhere to the position it advanced during Wesley’s trial and the statement by Stumpfs sentencing panel that “had [it] not been satisfied that *762 Stumpf was, in fact, the trigger man ... that may very well have had an effect upon this Court’s determination of whether the death penalty should follow.” I concur fully in Justice Stevens’s statement of principle in his Jacobs dissent and cannot help but find the prosecution’s actions in Stumpfs proceedings antithetical to every concept of justice and due process that we have sworn to uphold.
We have adhered, at least for the past 40 years, to the legal and moral principle that death as the ultimate punishment should “not be imposed under sentencing procedures that ereate[ ] a substantial risk that it would be inflicted in an arbitrary and capricious manner.” Gregg, 428 U.S. at 188, 96 S.Ct. 2909. There is yet another reason why the situation in this appeal epitomizes the arbitrariness that offends the very idea of due process: Stumpfs death sentence was a direct result of the order in which the two individuals, Stumpf and Wesley, were apprehended and brought to trial by the state. Without question, had Wesley been tried before Stumpf, instead of the other way around, Eastman’s testimony regarding the principal role played by Wesley would have resulted in Wesley receiving a jury-imposed sentence of death. Moreover, a subsequent trial of Stumpf would have included testimony that Wesley was the triggerman in the criminal spree and, possibly, information about capital punishment imposed upon Wesley, thus greatly reducing any chance that Stumpf would also have been sentenced to death. Indeed, under Ohio law, not being the principal offender is a “powerful mitigating factor,” such that “[v]ery few death sentences have been approved against persons who were not the principal offender.” State v. Green, 90 Ohio St.3d 352, 738 N.E.2d 1208, 1224 (2000) (citation omitted).
Similarly, had Stumpf and Wesley been tried together, Eastman’s testimony downplaying Stumpfs role in Mary Jane Stout’s murder would have been placed before the jury. That evidence, in conjunction with each co-defendant’s denial of his principal role in the offense again would have made it unlikely that any rational trier of fact could have concluded that Stumpf should have been sentenced to death.
Since Gregg, the United States Supreme Court, as well as federal courts of appeal, have struggled to ensure that any death sentence is imposed not for arbitrary reasons but, rather, only after measured deliberations and consideration of relevant factors that help identify those persons most responsible for the most depraved crimes against human nature and against society and its norms, “the worst of the worst.” It is abundantly clear to me that John David Stumpf was sentenced to be executed by the State of Ohio because he was apprehended before his co-defendant and, thus, was tried before Wesley. Because I am convinced that the same result would not have inured if Wesley had been the first of the two men to be tried, or if the two men had been tried together, it is obvious that the sentence of death in this case was not based upon any compelling evidence or objective criterion. It escapes me why the majority here is apparently blind to the fact that imposition of the death penalty based on such happenstance is the antithesis of fairness and due process. Indeed, in my mind, it is the very definition of arbitrariness and caprice.
As citizens of the last industrialized Western nation to maintain capital punishment,[3] we recognize that decisions con *763 cerning the death penalty must be left, for the most part, to our state and national legislative bodies. What then is left to the judiciary is the solemn responsibility to ensure fairness in the imposition of a penalty so drastic that, once carried out, cannot be undone. I had hoped that my colleagues on this court would be able to see through the sleight of hand by which the State of Ohio has attempted to justify the violation of due process that resulted in the arbitrary punishment imposed in this case. Unfortunately for all concerned, but especially for John David Stumpf, they have not. I therefore DISSENT from the majority’s decision upholding the death penalty in this case.

. Of course, that fact alone highlights a major legal and moral problem with the death penalty. Even before Wesley was tried, the State of Ohio had in its possession evidence establishing that if capital punishment were appropriate at all, it was Wesley and not Stumpf who should be executed. That evidence, however, came into the prosecution’s possession only through the fortuitous circumstance of Wesley conversing with a cellmate about the murder. If Wesley had not shared the details of his crime with Eastman, or if Eastman had not brought that information to the attention of the authorities, there would have been no way to verily the truthfulness of Stumpf’s account. Consequently, the State of Ohio might have executed an individual who otherwise would not have been sentenced to death — indeed, who would not even have been eligible for the death penalty. Because of the majority’s intransigence, that possibility of wrongful execution continues to exist.

. This Ohio judge undoubtedly had in mind the Supreme Court’s admonition in Enmund v. Florida, 458 U.S. 782, 797, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982):
Although the judgments of legislatures, juries, and prosecutors weigh heavily in the balance, it is for us ultimately to judge whether the Eighth Amendment permits imposition of the death penalty on one such as Enmund who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed. We have concluded, along with most legislatures and juries, that it does not.

. According to Amnesty International's March 2012 report on Death Sentences and 'Executions in 2011, the United States joined the select fraternity composed of only the following governing bodies when it purposefully executed some of its own citizens during calendar year 2011: Afghanistan, Bangladesh, *763 Belarus, China, Egypt, Iran, Iraq, Malaysia, North Korea, the Palestinian Authority, Saudi Arabia, Somalia, South Sudan, Sudan, Syria, Taiwan, the United Arab Emirates, Viet Nam, and Yemen. See http://www.amnesty.org/en/ library/asset/ACT5 0/001/2012/en/241 a83 01-05 b4-41 c0-bfd9-2fe72899cda4/act500012012 en.pdf, at 7, last visited March 2, 2013.